747 A.2d 830 (2000)
329 N.J. Super. 346
Charlene MACALUSO, Plaintiff-Respondent,
v.
Lori A. PLESKIN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 15, 2000.
Decided March 30, 2000.
*831 John L. McDermott, Bloomfield, for defendant-appellant (McDermott & McGee, attorneys; Mr. McDermott, on the brief).
Terence G. Vandzura, Edison, for plaintiff-respondent (Terence G. Vandzura, attorney; William J. Willard, on the brief).
Before Judges PRESSLER, BILDER and ARNOLD.
The opinion of the court was delivered by ARNOLD, J.S.C. (temporarily assigned)
This personal injury action arose from an automobile accident which occurred on February 17, 1995 in Old Bridge. Following a jury trial, plaintiff Charlene Macaluso was awarded $350,000. Defendant appeals contending, among other things, that the trial court erred in permitting a video entitled "Soft Tissue Animation" produced by Technical Medical Animation Corporation of Denver, Colorado, to be shown to the jury. We agree and reverse and remand for a new trial.
Briefly, the material facts in this matter are as follows. On February 17, 1995, plaintiff was driving her car south on Washington Avenue in Old Bridge and made a left turn to enter a driveway. Defendant Lori Pleskin was also driving south on Washington Avenue behind plaintiff, and when plaintiff turned defendant struck the left front wheel of plaintiff's car. Plaintiff sued and after a three-day trial, the jury returned a verdict in plaintiff's favor in the amount of $350,000. Defendant filed a motion for a new trial, or in the alternative, a remittitur which was denied.
Defendant raises the following points on appeal:
*832 POINT I
THE TRIAL COURT ERRED IN PERMITTING THE VIDEO ENTITLED "SOFT TISSUE ANIMATION" TO BE SHOWN TO THE JURY
POINT II
THE PLAINTIFF'S EXPERT WAS ERRONEOUSLY PERMITTED TO RECITE THE FINDINGS OF EXPERTS WHO DID NOT TESTIFY (Not raised below)
POINT III
COMMENTS OF PLAINTIFF'S COUNSEL DURING SUMMATION WERE AN IMPROPER PLEA TO SYMPATHY AND PASSION WHICH PREJUDICED THE DEFENDANT AND WERE CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT (Not raised below)
POINT IV
THE "COMPUTERIZED IMAGING" ALLEGEDLY MADE FROM X-RAYS TAKEN OF PLAINTIFF SHOULD NOT HAVE BEEN SHOWN TO THE JURY AND SHOULD NOT HAVE BEEN ENTERED INTO EVIDENCE (Not raised below)
POINT V
THE PRESENTATION TO THE JURY OF ALL THE TESTIMONY, DOCUMENTS, VIDEO AND SUMMATION COMMENTS DISCUSSED IN POINTS I THROUGH IV, TAKEN IN TOTAL WAS CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT AND UNFAIRLY PREJUDICING THE DEFENDANT
After jury selection and before opening statements, the trial court was made aware that plaintiff wanted to introduce the video entitled "Soft Tissue Animation" into evidence. Defendant objected generally to the introduction of the video and also objected to specific portions. The trial court regarded the video as a visual aid, redacted certain portions and permitted the remainder to be played for the jury. It was not, however, admitted into evidence. The only foundation laid for the playing of the video was the testimony of plaintiff's treating chiropractor, Dr. Weinstein, that he had viewed the video and believed it could be of assistance in helping the jury understand the anatomy of the cervical spine and the injuries claimed by plaintiff. He testified that he had no idea who made the video or why it was made and he never spoke to anyone involved in its production. After the video was played, the following testimony was elicited from Dr. Weinstein.
Q. [W]as there any section or any particular area under the injuries segment that you found to be particularly relevant in Charlene's case.
A. Mostly pertaining to the last sections where you had injuries to the muscles, as well as to the pinching of the nerves.
We have viewed the video. It is not a visual aid. As we understand it, a visual aid is a model, diagram or chart used by a witness to illustrate his or her testimony and facilitate jury understanding. Schnoor v. Palisades Realty and Amusement Co., 112 N.J.L. 506, 508, 172 A. 43 (E. & A.1934). Here, Dr. Weinstein never used the video as a visual aid. Indeed, in testifying about plaintiff's injury and treatment, he did not refer to the video. His only reference to the video is as set forth above. Rather than being a visual aid, the video is a compilation of drawings and animation accompanied by a voice describing what is presented visually. Although portions were redacted by the trial judge, the audio portions accompanying the animation which were played for the jury included the following:
WHEN THE SKULL IS STRUCK FROM THE FRONTOR SUBJECTED TO THE FORCES CREATED BY A REAR END IMPACT, THE HEAD AND NECK MOVE BACKWARD, THEN REBOUND FORWARD. CONVERSELY, WHEN THE SKULL IS STRUCK FROM THE REAROR SUBJECTED TO THE FORCES CREATED BY A FRONT END IMPACT *833 THE HEAD AND NECK MOVE FORWARD AND THEN REBOUND BACKWARD.
AS WE VIEW THE LOWER PORTION OF THE CERVICAL SPINEC4 THROUGH T1DURING THESE SAME MOTIONS, IT IS IMPORTANT TO NOTE THAT AS LONG AS THE RANGE OF MOTION DOES NOT EXCEED NORMAL PARAMETERS THERE MAY BE LITTLE OR NO INSULT TO THE TISSUES OR BONY STRUCTURES. HOWEVER, WHEN HYPEREXTENSIONOR HYPERFLEXIONOCCURS, ANY NUMBER OF TISSUES CAN BE INJURED.
TO UNDERSTAND HOW THESE INJURIES MAY OCCUR IT IS NECESSARY TO VIEW EACH STRUCTURAL ELEMENT SEPARATELY.
NERVE PINCH
NERVE TISSUE IS FRAGILE. DAMAGE TO THESE TISSUES IS NOT ASSOCIATED WITH ANY ONE MOVEMENT BUT CAN RESULT ANY TIME MUSCLES, LIGAMENTS OR BONES ARE MOVED BEYOND THEIR NORMAL RANGE. MOVEMENT OF, OR COMPRESSION OF THE INTERVERTEBRAL DISC, CAN RESULT IN A NERVE ROOT "PINCH".
THIS IS A VIEW OF TWO CERVICAL VERTEBRAE. THE TOP VERTEBRA IS TRANSPARENT TO ALLOW U.S. TO VIEW HOW THE NERVE ROOTS EXIT THE SPINAL CORD FROM BETWEEN THESE BONES.
WHEN THE NECK IS SUBJECTED TO COMPRESSION, EITHER FROM A BLOW TO THE TOP OF THE HEAD OR IMPACT ON SOME OBJECT, THE MOVEMENT OF THE VERTEBRAE FORCE THE INTERVERTEBRAL DISC TO EXPAND BEYOND ITS NORMAL POSITION AND PUSH AGAINSTOR "PINCH" THE NERVE ROOT.
NERVE PINCHES MAY ALSO BE THE RESULT OF HYPERFLEXION AND HYPEREXTENSION. THIS IS A SIDE VIEW OF THE ROOT NERVE EXITING FROM BETWEEN THE VERTEBRAE. WHEN SUBJECTED TO A SHIFTING OF THE VERTEBRAE ON EACH OTHER, THE NERVE CAN BECOME TRAPPED BY THE SURROUNDING MORE RIGID STRUCTURES. THIS ENTRAPMENT RESULTS IN THE RADIATION OF PAIN, BUT DOES NOT NECESSARILY RESULT IN THE LOSS OF FUNCTION.
OFTEN, WHEN NERVES ARE "PINCHED" ONLY A PORTION OF THE NERVE IS DAMAGED. A CLOSER LOOK SHOWS HOW NERVE TISSUE CAN BE "PINCHED"OR DAMAGED WHEN IT IS COMPRESSED BETWEEN TWO, MORE RIGID STRUCTURES AND HOW "INCOMPLETE" DAMAGE CAN OCCUR.
HERE WE SEE NERVE SIGNALS TRAVELING THROUGH A SIMPLIFIED PICTURE OF A NERVE COMPLEX. THE SIGNALS MOVE IN ONLY ONE DIRECTION ALONG EACH PATHWAY. WHEN THE NERVE TISSUE IS FORCED AGAINST A BONE OR OTHER RIGID STRUCTURE, SOME OF THE SIGNALS ARE NOT ABLE TO MOVE PAST THE "PINCH". THIS CAN OCCUR EVEN WHEN THE NERVE IS STILL INTACT. IT IS NOT NECESSARY TO TEAR NERVE TISSUE TO CAUSE IT TO DYSFUNCTION.

THIS SCHEMATIC SHOWS HOW THE NERVE SIGNAL MOVES ALONG AN AXON. THE TOP IS MYELINATED FIBER AND THE BOTTOM IS UNMYELINATED. THE INSIDE OF THESE FIBERS HAVE A NEGATIVE ELECTRICAL CHARGE, AND THE OUTSIDE A *834 POSITIVE ELECTRICAL CHARGE. THE MOVEMENTOR FLOW-FROM THE POSITIVE TO THE NEGATIVE CREATES ELECTRICAL CURRENT. IN NERVE CELLS, THAT ELECTRICAL CURRENT IS REFERRED TO AS AN IMPULSE. THE PROCESS OF DEPOLARIZATION OF THE CELL MEMBRANE ALLOWS THE POSITIVE IONS TO PASS THROUGH THE CELL MEMBRANE AND FLOW TOWARD THE NEGATIVE IONS WITHIN THE CELL. IT IS THIS EXCHANGE OF POSITIVE AND NEGATIVE IONS THAT IS THE NERVE IMPULSE.
DAMAGE OF ANY KIND TO THE CELL MEMBRANE MAY INTERFERE WITH THE POSITIVE IONS' ABILITY TO PASS THROUGH THAT MEMBRANE, RESULTING IN THE CELL'S INABILITY TO CONTINUE IMPULSE TRANSMISSION. THE NATURE OF THE DAMAGE MAY BE AS MINIMAL AS BRUISING, BUT IF THAT DAMAGE RESULTS IN SCARRING, THE NERVE FIBER MAY NEVER FUNCTION PROPERLY AGAIN.

FASCIA AND MUSCLE STRAINS
A COMMON INJURY ASSOCIATED WITH VIOLENT MOVEMENT OF THE NECK IS THE TEARING OF THE TISSUES OF THE MUSCLE COMPLEX. THE MUSCLES OF THE BODY ARE SURROUNDED BY A SLIPPERY, FIBROUS TISSUE. THE FASCIA.
THE FASCIA PERFORMS A NUMBER OF FUNCTIONS. IT PROVIDES PATHWAYS FOR THE VESSELS AND NERVES TO THE MUSCLES, AND SURROUNDS THEM IN NEUROVASCULAR SHEATHS. THE FASCIA SERVES AS AN ELASTIC CONTAINER FOR THE MUSCLES, MAKING THEIR CONTRACTION AND ELONGATION MORE EFFICIENT. IT ALSO PROVIDES CONNECTIONS FOR THE TENDONS WHICH, IN TURN, ARE ATTACHED TO BE BONE PERIOSTEUM, A TISSUE LINING OF BONES.
WHEN SUBJECTED TO EXCESSIVE ELONGATION, THE FASCIA TENDON CONNECTIONS AND PERIOSTEUM CAN ALL BE TORN. IN THIS VIEW, THE MOST OBVIOUS INJURY IS CENTRALLY LOCATED IN THE FASCIAL SHEATH. THESE INJURIES OFTEN BULGE AT THE POINT OF INSULT AND BECOME VISIBLE "TRIGGER POINTS" AT THE SURFACE OF THE SKIN. TRIGGER POINTS ARE PAIN SENSITIVE WHEN PRESSURE IS APPLIED TO THEM.
LESS OBVIOUS IS THE DAMAGE WHICH MAY OCCUR IN THE FASCIAL TENDON CONNECTION AT THE TOP, AND AT THE TENDON PERIOSTEUM ADHESION AT THE BOTTOM. ALL OF THESE INJURIES WILL AFFECT THE FLEXIBILITY OF MUSCLES BY THE FORMATION OF SCAR TISSUE.
SCARRING OF THE FASCIA WILL SHORTEN THE LENGTH OF THE MUSCLE SHEATH AND SCARIFICATION OF THE CONNECTION POINTS WILL MAKE THEM WEAKER DUE TO THEIR LOSS OF FLEXIBILITY.
IT ALSO IS POSSIBLE FOR THE MUSCLE FIBERS TO BE TORN. THIS ILLUSTRATION SHOWS THE DEEPER LAYERS OF THE FASCIA SURROUNDING THE MUSCLE FIBERS. THE NERVES SUPPLYING THESE FIBERS HAVE BEEN ENLARGED TO MAKE THEM MORE VISIBLE. WHEN THE SKULL AND NECK ARE SUBJECTED TO VIOLENT MOTIONS, THE MUSCLE CONTRACTS IN AN ATTEMPT TO HOLD ITS POSITION. IF THE FORCE OF THE MOTION IS *835 GREATER THAN THE STRENGTH OF THE INDIVIDUAL CELLS, MICROSCOPIC TEARS CAN RESULT. THESE TEARS ARE COMMONLY REFERRED TO AS SPRAINS. THEY MAY DAMAGE THE CELL TISSUES, BUT THEY MAY ALSO DAMAGE THE NERVES THAT LINK THE CELL TO THE BODY'S COMMUNICATION SYSTEM. OVER TIME, SCAR TISSUE MAY DEVELOP WHERE THE CELL WAS TORN CAUSING THAT CELL TO BECOME LESS FLEXIBLE. IF THIS SCARRING OCCURS IN A LARGE NUMBER OF INDIVIDUAL MUSCLE CELLS, IT MAY HAVE A PROFOUND EFFECT ON THE WHOLE MUSCLE'S ABILITY TO PERFORM.
[emphasis added]
It is clear the video tape played for the jury was testimonial in nature and that its contents were susceptible of being accepted by the jury as substantive evidence. It contained a great deal of subject matter that was not relevant to plaintiff's precise medical condition and included speculation regarding the possible consequences of hypothetical injuries. For those reasons it should not have been played for the jury. Cf. People v. Hood, 53 Cal.App.4th 965, 62 Cal.Rptr.2d 137 (1997), cert. denied, 522 U.S. 1093, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998) (holding that computer animation of shooting was admissible to illustrate expert's testimony); Balian v. General Motors, 121 N.J.Super. 118, 296 A.2d 317 (App.Div.1972), certif. denied, 62 N.J. 195, 299 A.2d 729 (1973) (holding that there is no inherent objection to the admissibility of motion pictures of an experiment but finding prejudice to admission in the case because of failure of proponent to provide pre-trial discovery regarding experiment and taking of film). The error in playing it for the jury was compounded when plaintiff's counsel discussed the video in his summation. He said:
And also, you saw on the videoand I realize a lot of the video was maybe a little bit boring, but there was a couple of parts in there that talked about the nerves and how the nerves ran and and how when you get a pinch in that nerve it stops theelectrical signals from going through andand that's what causes part of the problems and the numbness. That also kind of illustrated for you thethe types plaintiff problems we are dealing with.
Because the portions of the video played for the jury were clearly capable of producing an unjust result, we reverse and remand. R. 2:10-2. In light of our disposition of the principal issue and the remand for a new trial, we need not decide defendant's remaining arguments which were not raised below. Because of the possibility, however, that these issues will recur, we add the following brief commentary concerning several of defendant's contentions.
Dr. Weinstein testified that he had conducted a number of tests on plaintiff. These tests, he reported, were positive for spasm, positive for irritation of the nerves in the neck, showed a reduction in range of motion of the neck and loss of normal curvature of the cervical spine. From these test results, Dr. Weinstein diagnosed plaintiff with post-concussion syndrome, a strain and sprain of the cervical and thoracic areas of the back, nerve root compression, right arm radiculopathy and loss of cervical curve. As a result of this diagnosis, Dr. Weinstein referred plaintiff to a neurologist, Dr. del Valle and an orthopedic surgeon, Dr. Abboudi. Dr. Weinstein testified that Dr. del Valle examined plaintiff and conducted tests of his own. According to Dr. Weinstein's testimony, Dr. del Valle diagnosed post-traumatic cervical radiculopathy, thoracic strain injury, headaches, blurred vision and nystagmus. Dr. Weinstein also testified that Dr. Abboudi examined plaintiff and ordered his own diagnostic tests including another EMG which was performed by a Dr. Karcnik. The results of these tests showed latencies (delays in nerve signals) on plaintiff's right *836 side and injury to the nerve root. Dr. Weinstein testified that Dr. Abboudi diagnosed plaintiff with a sprain of the cervical spine, nerve impingement in the right shoulder, carpel tunnel syndrome, and early neuritis in the ulnar nerve. After Dr. Weinstein described the diagnoses of Drs. del Valle and Abboudi, plaintiff's counsel questioned Dr. Weinstein as to whether these findings were consistent with his own independent findings. Dr. Weinstein answered in the affirmative. Neither Dr. del Valle nor Dr. Abboudi testified at trial.
On appeal, defendant objects to Dr. Weinstein's testimony regarding the diagnoses of Drs. del Valle and Abboudi on two grounds. First, defendant contends that Dr. Weinstein's testimony regarding the diagnoses of Drs. del Valle and Abboudi amounted to the improper admission of hearsay evidence as neither doctor testified. Second, defendant claims that plaintiff's counsel's reference to Drs. del Valle and Abboudi during summation essentially gave their findings the weight of substantive expert evidence. Defendant contends that both instances were "extremely prejudicial to defendant and prevented defendant from obtaining a fair trial."
An expert may base an opinion or inference on facts or data which he perceived or which were "made known to him at or before the hearing," if they are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. N.J.R.E. 703. See Rubanick v. Witco Chemical Corp., 125 N.J. 421, 593 A.2d 733 (1991); State v. Burris, 298 N.J.Super. 505, 511-12, 689 A.2d 860 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997). It is also well established that an expert may testify as to the opinion of a non-testifying expert on which the testifying expert relied in reaching his or her conclusion. See, e.g., State v. Alexander, 7 N.J. 585, 83 A.2d 441 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 638, 96 L.Ed. 1326 (1952) (medical examiner, while testifying about a wound made by a sharp cutting instrument, was properly permitted to testify that he had based his diagnosis, in part, on tests made by a laboratory technician and on photographs which were not in evidence); Glowacki v. Underwood Memorial Hosp., 270 N.J.Super. 1, 17, 636 A.2d 527 (App.Div.1994) (doctor properly permitted to testify that she relied on discussion with a radiologist about an MRI in concluding that plaintiff's fourth lumbar disc was crushed); Blanks v. Murphy, 268 N.J.Super. 152, 162, 632 A.2d 1264 (App.Div. 1993) (doctor may testify that he relied on opinion of doctor at hospital where plaintiff was taken for treatment that there was no spasm); Dietzeman v. Peterson, 196 N.J.Super. 96, 101, 481 A.2d 596 (Law Div.1984) (doctor could testify concerning the history of past and present complaints made to him by injured plaintiff where such complaints corroborated doctor's diagnosis.) But cf. Nowacki v. Community Med. Center, 279 N.J.Super. 276, 652 A.2d 758 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995) (defense experts could not testify as to their reliance on hospital records containing detailed medical opinions.) While we recently noted in Krohn v. N.J. Full Ins. Underwriters, 316 N.J.Super. 477, 486, 720 A.2d 640 (App. Div.1998), certif. denied, 158 N.J. 74, 726 A.2d 937 (1999), that "[a]n expert witness should not be allowed to relate the opinions of a nontestifying expert merely because those opinions are congruent with the ones he has reached," we hold that a treating doctor may testify as to the opinions of a nontestifying doctor if the treating doctor relied on those opinions in reaching his or her diagnosis or in formulating a plan of treatment and management of the patient.
On retrial, Dr. Weinstein should be permitted to testify as to the opinions of Drs. del Valle and Abboudi only if it is determined that he relied on those opinions in making his own diagnosis or in formulating a plan of treatment and management of plaintiff.
*837 Defendant contends that the trial court erred by allowing computerized images of x-rays of plaintiff to be shown to the jury and entered into evidence. We disagree. Dr. Weinstein took x-rays of plaintiff's cervical spine. He ordered computer images to be made from two sets of x-rays. These images compared the cervical spine of plaintiff to the image of a normal cervical spine. At trial, Dr. Weinstein testified that the computer images were a fair and accurate depiction of the x-rays he had taken. Defendant objected on the grounds that Dr. Weinstein had not made the computerized images. Where a treating physician identifies x-rays which were taken at his direction and for his use, an adequate foundation is laid for the admission of the x-rays even if the physician was not the person who took them. Gindin v. Baron, 16 N.J.Super. 1, 8, 83 A.2d 790 (App.Div.1951). We see no reason not to extend that rule to computerized images of such x-rays. Therefore, if properly authenticated, these computerized images are properly admissible.
Reversed and remanded for a new trial.