813 A.2d 1219

KEVIN T. PERSLEY, PLAINTIFF--APPELLANT, v. NEW JERSEY
TRANSIT BUS OPERATIONS AND GABE BARRENTINE,
DEFENDANTS--RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 17, 2002—Decided January 17, 2003.

Before Judges WEFING, WECKER and LISA.

*Arthur J. Russo* argued the cause for appellant.

*Esther E. Bakonyi,* Deputy Attorney General, argued the cause for respondents (*David Samson,* Attorney General, attorney for respondents; *Michael J. Haas,* Assistant Attorney General, of counsel; *Ms. Bakonyi and Karen L. Jordan,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LISA, J.A.D.

Plaintiff, Kevin T. Persley, appeals from a judgment entered on a jury verdict awarding him no damages in this personal injury action where liability was conceded by defendants, New Jersey Transit Bus Operations, Inc. and Gabe Barrentine. On appeal, plaintiff argues the trial judge committed reversible error by permitting a video presentation to the jury of a computer-generated simulation of the accident. He further argues he was denied a fair trial because the trial judge (1) improperly curtailed his cross-examination of certain defense experts, (2) allowed defense counsel to pose improper questions in cross-examining him, (3) refused to

permit plaintiff to present certain rebuttal testimony, and (4) allowed the defense to utilize certain inadmissible evidence and make improper arguments. We reject these arguments and affirm.

## I

On May 17, 1990, plaintiff was a passenger in defendants' bus, commuting to work in New York City. According to the bus driver, Barrentine, while traveling on Route 80, he slowed the bus to thirty-five to forty miles per hour when it began to drizzle. When a car spun out approximately two car lengths in front of the bus, Barrentine applied his brakes, but was unable to stop before colliding with the rear-end of the car in front of him, operated by James Marquis. Barrentine immediately inquired whether any passengers were injured, with no response. The police soon arrived, and again no passengers reported injuries. All passengers, including plaintiff, were loaded onto a replacement bus and continued to their destination. The impact was at a low velocity. Marquis' car was stopped when it was struck by the bus, and was pushed forward only about one to two feet. It sustained only minor damage to the rear bumper. The trunk did not pop open, and there was no damage to the sides. The bus incurred no damage. Both vehicles were driveable. According to the unrefuted testimony of defendants' accident reconstruction expert, the speed of the bus at impact was six miles per hour.

Plaintiff was asleep just prior to the accident. He described the events as follows: He recalled waking up as his body was being thrown forward and flinging up his hands in an unsuccessful attempt to prevent his head from striking the metal handle on the seat in front of him. As his hands and the left side of his head, including his left eye area, struck the handle, plaintiff heard a pop, saw a bright light and lost consciousness. While he quickly regained consciousness, he remained dazed and confused. Although disoriented, plaintiff managed to board the new bus without incident and did not report the problems he was having

because he thought he would soon feel better. Once on the new bus, however, his hands started to shake uncontrollably and, upon arriving in New York, he immediately located a pay phone and called his longtime chiropractor, Dr. Hellender, who specialized in headache relief. After scheduling an appointment for that same day, he called in sick to work and returned to New Jersey.

According to plaintiff, as a result of the accident, he sustained: (1) disc herniations in his cervical and lumbar spine which were treated with surgery in 1996 and 1997, but which left him with periodic back pain which sometimes spreads down his arms and legs; (2) continuous migraine headaches; (3) a retinal tear in his left eye, which was repaired in 1991; (4) a permanent brain injury which left him with intermittent vertical jumping (a vision impairment), balance problems and considerable neurological deficits; (5) hearing loss and tinnitus; (6) an injury to his temporal mandibular joint, requiring the permanent usage of an orthodontic device; and (7) bilateral carpal tunnel syndrome, which was treated with surgery but ultimately returned. He treated with numerous doctors. Plaintiff reported that, due to his ongoing problems, and after being fired from several sales jobs for lack of production, he finally stopped working in May 1998. He stated he takes ten or eleven medications on a regular basis and no longer enjoys life or has any goals.

On May 29, 1986, plaintiff was rear-ended by a small pickup truck while stopped at a traffic light, with sufficient force to push his car sixty feet. As a result, he obtained treatment for neck stiffness and pain, lower back pain, "rubber band" headaches, dizziness, blurred vision, and numbness and tingling in his hands. Plaintiff also acknowledged receiving treatment for many of these same symptoms prior to the 1986 accident, as far back as 1984. Although plaintiff asserted his chiropractor, Dr. Joseph Tuzzeo, discharged him pain and symptom free a year after the 1986 accident, he admitted that: (1) he had been told that his headaches were chronic and would continue; (2) he subsequently returned to Tuzzeo complaining of vertigo, blurred vision, neck

pain, stiffness and trembling in his hands; (3) he consulted with at least five doctors between late 1987 and early 1990 complaining of persistent neck pain, chronic headaches, dizziness and trouble with his vision; and (4) in connection with the lawsuit he filed following the 1986 accident, he executed a certification dated July 1990 in which he represented he had been advised he would have headaches for the rest of his life as a result of the 1986 accident.

Plaintiff was involved in a third automobile accident on November 10, 1993, when a seventeen-year-old driving an old car in the wrong direction across a parking lot rammed into the side of his car. Plaintiff acknowledged he had increased neck and back pain from this accident, but contends it lasted only about two weeks, after which he returned to his condition before that accident. Plaintiff complained of severe back pain and left the scene in an ambulance. However, plaintiff reported that none of his treating physicians felt he sustained any new injury and he decided not to sue the driver responsible for the accident.

The trial of the case before us spanned three weeks. Both sides called numerous medical experts, specializing in fields including dentistry, neurology, opthamology, neuropsychiatry, orthopedics, ear, nose and throat, and rehabilitation and pain management. Plaintiff also called an expert in speech and language pathology and a psychological-vocational expert. We need not recount the conflicting testimony and opinions of these experts because the substantive aspects of their testimony is not a basis of the appeal. Nor is it contended the verdict is against the weight of the evidence. Rather, plaintiff contends that the trial was conducted unfairly, with the trial judge improperly injecting himself into the trial, improperly curtailing his ability to cross-examine defense witnesses, allowing defendant's counsel to utilize improper cross-examination techniques on him, and allowing defendants to utilize inadmissible evidence and make improper arguments. We can summarize the medical opinions by noting that plaintiff's doctors opined that his complained-of conditions were caused by the May 17, 1990 accident. Defendants' doctors, on the other hand, opined

that plaintiff suffered no substantial injury, that either the injuries did not exist or they were not caused by the May 17, 1990 accident, and that plaintiff was a malingerer who was grossly exaggerating his complaints.

Dr. Wayne Nolte, an engineer, testified on behalf of the defense as an accident reconstruction expert. Nolte gathered data regarding the size and weight of the bus and the Marquis car, the damage to the Marquis car, plaintiff's height, weight, position in the bus and recollection of the accident, and the dimensions of the seat on which plaintiff was sitting and the location of the handle he struck. Nolte also reviewed: (1) Barrentine's deposition testimony that he was traveling at only thirty to forty miles per hour when the spin-out happened, that he pumped his brakes and did not skid, and that the entire sequence of events took place within three to four seconds; and (2) Marquis' deposition testimony that he was stopped for four to six seconds before the bus struck him and that his car moved forward only one to two feet upon impact.

Assuming the bus was traveling at forty miles per hour at the time the spin-out occurred, and the collision occurred four seconds later, Nolte determined the bus struck the car at six miles per hour. He further determined that, as the bus decelerated, plaintiff's head moved forward at a speed of 3.6 inches per second. Nolte furnished all of this information to an animator and instructed him to prepare a simulation depicting the movement of plaintiff's body during the four-second period leading up to the impact. Nolte later reviewed the finished animation to confirm its accuracy.

Nolte conceded that, because he was not a biomechanical engineer, he could not say, nor was the animation intended to depict, the force with which plaintiff's head struck the seat in front of him. Nolte further acknowledged that, if the various factors he used in his calculations, such as the speed of the bus, were not accurate, the video would not be an accurate representation of the movement of plaintiff's body. The four-second animation was

shown to the jury first in real time, and then in slow motion over the course of sixteen seconds.

Although Nolte insisted that his animation was accurate, he admitted that: (1) there was deposition testimony from Marquis that he and all of the traffic around him was traveling at 55 miles per hour at the time of the spin-out; (2) at the time of the accident, Barrentine had reported to the responding police officer that he braked and slid into the car in front of him; and (3) Barrentine had not been certain that the accident occurred over the course of four seconds. Nolte additionally conceded that the animation did not depict the effect on plaintiff's body of Barrentine's admitted swerving just prior to the accident.

## II

Plaintiff contends he is entitled to a new trial because of the trial judge's improper curtailment of his cross-examination of four medical expert witnesses and Dr. Nolte. According to plaintiff, not only was he denied the right to properly cross-examine these witnesses, but the judge's actions and remarks in this regard revealed the judge's disdain for plaintiff's counsel and his disbelief in the merits of plaintiff's case.

The conduct of a trial, including cross-examination and its appropriate limits, is within the discretion of the trial court. *Casino Reinvestment Dev. Auth. v. Lustgarten,* 332 *N.J.Super.* 472, 492, 753 *A.*2d 1190 (App.Div.), *certif. denied,* 165 *N.J.* 607, 762 *A.*2d 221 (2000); *see also N.J.R.E.* 611(b). Exercise of that discretion is ordinarily not interfered with unless there is a clear abuse of discretion which has deprived a party of a fair trial. *Daisey v. Keene Corp.,* 268 *N.J.Super.* 325, 334, 633 *A.*2d 979 (App.Div.1993).

Although great latitude is given to a trial court in the conduct of a trial, there are bounds within which the judge must stay. *Mercer v. Weyerhaeuser Co.,* 324 *N.J.Super.* 290, 298, 735 *A.*2d 576 (App.Div.1999). A judge must "conduct the trial in a fair

and impartial manner, without making remarks that might preju-
dice a party or which are calculated to influence the minds of the
jury." *Cestero v. Ferrara*, 110 *N.J.Super.* 264, 273, 265 *A.*2d 387
(App.Div.1970), *aff'd*, 57 *N.J.* 497, 273 *A.*2d 761 (1971). A judge
should never unfairly criticize or humiliate counsel, especially in
front of the jury. *Mercer v. Weyerhaeuser Co., supra*, 324
*N.J.Super.* at 298, 735 *A.*2d 576. A judge's failure to abide by
these guidelines "can easily prejudice a jury since it conveys the
opinion of the judge as to his belief or disbelief in one side of the
case." *State v. Zwillman*, 112 *N.J.Super.* 6, 21, 270 *A.*2d 284
(App.Div.1970), *certif. denied*, 57 *N.J.* 603, 274 *A.*2d 56 (1971).
Alleged misconduct by a trial judge must be reviewed within the
context of the entire record in order to determine its prejudicial
impact. *Mercer v. Weyerhaeuser Co., supra*, 324 *N.J.Super.* at
298, 735 *A.*2d 576.

 ▪ Plaintiff complains of the trial judge's rulings and demean-
or in cross-examination by his counsel of Doctors Kutner (neuro-
psychiatrist), Heller (orthopedist), Rothman (neurologist), and
Liva (opthamologist). From our review of the record, we are
satisfied the trial judge did not abuse his discretion. The recur-
ring problem that arose during cross-examination of these wit-
nesses involved the attempts by plaintiff's counsel to read favor-
able portions of reports from plaintiff's doctors under the guise of
posing questions to defendants' doctors. This was after the
defense doctors testified they had reviewed the plaintiff's doctor's
report and it did not change their opinions. Upon objections
being made, the trial judge admonished plaintiff's counsel at
sidebar conferences to refrain from this practice. When counsel
persisted, the judge did admonish him in the presence of the jury.
To a lesser extent, plaintiff points to instances where the judge
admonished his attorney in the jury's presence for asking repeti-
tive questions and questions regarding matters not in dispute.

In the overall context of this lengthy trial we are not persuaded
that these incidents, individually or collectively, deprived plaintiff
of a fair trial. We agree with the trial judge's rulings substantive-

ly, and we do not detect in the judge's demeanor any pervasive criticism of plaintiff's counsel or undermining of plaintiff's case. We note that the judge sustained and overruled many objections made by both sides throughout the trial. We are convinced he conducted the trial evenhandedly. Contrary to plaintiff's suggestion, the judge's conduct and remarks here pale in comparison to the numerous "intemperate rebukes" of counsel and insulting asides to the jury in *Mercer v. Weyerhaeuser Co., supra*, where the trial judge frequently "telegraphed to the jury that he had little respect for defense counsel's legal acumen and trial skills" and "create[d] the impression that she did not know what she was doing." 324 *N.J.Super.* at 313, 314, 315, 735 *A.*2d 576.

■ Plaintiff contends the trial judge improperly interfered with his cross-examination of Nolte as follows:

[Plaintiff's counsel]: Okay. Well, let's talk about first the speed. Did you look at Mr. Marquis' deposition as to what he indicated the speed of himself and the other vehicles around him was?

[Nolte]: Yes.

[Plaintiff's counsel]: And particularly on his deposition . . ., didn't he say that his speed was approximately 55 miles an hour, a little under, and the speed that everyone was traveling around him was 55?

[Nolte]: Prior to the scenario happening, yes.

[Plaintiff's counsel]: Well, prior to him braking he was going 55 and he said the traffic was moving at 55?

[Nolte]: That's correct, that's correct.

[Plaintiff's counsel]: Now, Mr. Barrentine said that his speed, before he started braking, was 30 to 40 miles per hour?

[Nolte]: That's correct.

. . . .

[Plaintiff's counsel]: Doctor, you took Mr. Barrentine's testimony—and that was the first element—that he was going 35 to 40 miles an hour?

. . .

[Nolte]: That was the only information I had, in all of the information, that gave me a point in time and gave me a speed.

[Plaintiff's counsel]: Okay.

[Nolte]: And that's what I relied on.

[Plaintiff's counsel]: So if his speed was 55 miles per hour, that would make a difference to this end result. Correct?

[Defense counsel]: Your Honor, I have to object. I mean—

[Plaintiff's counsel]: Again—

THE COURT: I'll overrule the objection.

Let the witness answer the question.

[Nolte]: Okay. If Mr. Barrentine's testimony is now 55 miles per hour, yes, that does change it.

THE COURT: *Okay. But let the record reflect there's no evidence on anyone's part that his speed was 55 miles an hour. Just so that we all know that.*

*Yes, you could say if his testimony was that he was going 90 miles an hour, that would change it. Sure it would change it. We all understand that.*

[Plaintiff's counsel]: Judge—okay.

THE COURT: *There's no testimony from Mr. Barrentine that he was going 55 miles an hour when he's slowed for this car ahead of him.*

[Plaintiff's counsel]: Well, do you know how close Mr. Barrentine was before he started braking to the car in front of him?

[Nolte]: Yes. I believe a few car lengths.

[Plaintiff's counsel]: Okay. And do you recall what Mr. Marquis said about his speed before he started braking?

[Nolte]: Well, he—at some point he was traveling at the speed limit. But he doesn't give a point in time when he reduced his speed to flow with the traffic.
. . . .

[Plaintiff's counsel]: Let's go back. Let's go down to page 17, Doctor Nolte. On page 17 of Mr. Marquis['] . . . deposition. Let's go to line 14.

What was the speed of vehicles in the far left lane as you were traveling before the car in front spun out?

Do you see that, sir?

[Nolte]: Yes.

[Plaintiff's counsel]: And do you see the answer: We were at the limit. At that point it's 55 or a little below.

Do you see that?

[Nolte]: Yes, I do.

[Plaintiff's counsel]: Was there a reason for being below the limit? That was what traffic was doing. . . . Was traffic moving consistently at or near the speed limit? Yes. Had it been moving for some time before this accident occurred? Yes. . . . You were traveling for some time at or near the speed limit? Yes.

Do you see that, sir?

[Nolte]: Yes, I do.

[Emphasis added.]

Plaintiff claims the emphasized comment by the judge "tainted" his entire cross-examination of Nolte because there was other evidence that the bus was traveling at a higher speed. We disagree. While the judge did initially state there was *no* evi-

dence that Barrentine had been driving at 55 miles per hour, he then clarified that there had been no testimony from Barrentine to this effect. Further, plaintiff's counsel was subsequently permitted to make his point that Marquis had testified during his deposition that he and all of the traffic around him were traveling at the speed of 55 miles per hour when the spin-out occurred, and that this evidence had been disregarded by Nolte in preparing his simulation. The cross-examination of Nolte was not tainted by the trial judge's intervention.

### III

We next address plaintiff's contention that the trial judge committed reversible error when he permitted the jury to view the video simulation of the accident prepared at Nolte's direction. Plaintiff also argues the trial judge improperly endorsed the animation through his questioning of Nolte. We disagree.

In the course of Nolte's testimony, after Nolte explained the information utilized and the procedure for making the video simulation, defense counsel asked that the jury be permitted to view the video. Before permitting plaintiff's counsel to voir dire Nolte regarding the video, the trial judge inquired of Nolte as follows:

THE COURT: Does that—this animation, it's not a person in the seat. It's a virtual person. Is that—

[Nolte]: Correct.

THE COURT: And does this animation accurately depict what would happen with a person of the same height, build as the plaintiff, given the same type of accident?

[Nolte]: Absolutely. Absolutely.

During the subsequent voir dire by plaintiff's counsel, before the jury, Nolte conceded that, because he was not a biomechanical engineer, he could not say, nor was the animation intended to depict, the force with which plaintiff's head struck the seat in front of him. Nolte further acknowledged that, if the various factors he used in his calculations, such as the speed of the bus, were not accurate, the video would not be an accurate representation of the movement of plaintiff's body.

After plaintiff's counsel concluded his voir dire, he objected to admission of the simulation on the ground that it failed to recreate all of the variables of the accident and left the prejudicial impression that the accident happened exactly the way it was depicted in the video. The judge disagreed. The four-second animation was shown to the jury in real time and in slow motion over the course of sixteen seconds.[1] Thereafter, plaintiff's counsel cross-examined Nolte as follows:

[Plaintiff's counsel]: Doctor, the illustration that you gave and your conclusions are based upon certain facts that you brought into the formula. Isn't that correct?

[Nolte]: The facts that were testified to by the various parties.

[Plaintiff's counsel]: Well, let's take them one at a time, Doctor.

If any of those factors change, Doctor, we have a different picture here. Don't we?

[Nolte]: Oh, if anybody changes their testimony, absolutely you have a different picture. Sure. Depends on how they change.

Nolte conceded the video simulation would have been different if he had relied upon certain other record evidence which suggested that Barrentine had been traveling at a speed greater than forty miles per hour and had jammed on his brakes before sliding into the car in front of him only three seconds later. He also conceded that the animation did not depict the effect on plaintiff's body of Barrentine's admitted swerving just prior to the accident and that he was not able to calculate the forces that were brought to bear on plaintiff's body.

Admissibility of evidence concerning reconstruction of a particular event is within the area of judicial discretion and turns on whether the reconstruction sufficiently duplicates the original event as described by witnesses or participants. *Balian v. General Motors*, 121 *N.J.Super.* 118, 126, 296 *A.*2d 317 (App.Div.1972), *certif. denied*, 62 *N.J.* 195, 299 *A.*2d 729 (1973). A motion picture of a reconstruction of a particular event may be admitted into evidence when relevant and where its probative value is not offset

---

[1] The video, shown only once to the jury, first showed a side view in real time and slow motion, followed by an overhead view in real time and slow motion.

by undue prejudice, unfair surprise, undue consumption of trial time, or possible confusion of issues due to the introduction of collateral matters. *Id.* at 127, 296 *A.*2d 317. Notably, the danger of undue prejudice as a result of the jury's placing inordinate weight on a motion picture is always present due to the tremendous dramatic impact of motion pictures and the fact that the presentation of a motion picture is generally cumulative to the testimony of the expert who oversaw its production. *Id.* at 128–29, 296 *A.*2d 317.

We reject plaintiff's initial contention that the trial judge endorsed the animation through his questioning of Nolte. In context, these questions were simply an attempt to confirm that Nolte had taken into account plaintiff's actual measurements in designing the virtual person seen in the simulation. As defendants note, the judge's question about whether the animation accurately depicted what it purported to show (vis a vis the type of accident and the height and build of plaintiff) was obviously aimed at determining the admissibility of the video illustration. While these questions should have been asked outside of the presence of the jury during a proper *N.J.R.E.* 104 hearing, they were not, as plaintiff contends, an improper attempt by the court "to enhance the credibility of the witness to the jury." We are satisfied the judge's questions did not have that effect.

Plaintiff next contends, relying upon of *Suanez v. Egeland*, 330 *N.J.Super.* 190, 749 *A.*2d 372 (App.Div.2000), *Crispin v. Volkswagenwerk AG*, 248 *N.J.Super.* 540, 591 *A.*2d 966 (App.Div.), *certif. denied*, 126 *N.J.* 385, 599 *A.*2d 162 (1991), and *Macaluso v. Pleskin*, 329 *N.J.Super.* 346, 747 *A.*2d 830 (App.Div.), *certif. denied*, 165 *N.J.* 138, 754 *A.*2d 1214 (2000), that he was unduly prejudiced when the jury was permitted to watch the video simulation of the accident which was prepared based upon only select evidence. We disagree.

In *Suanez v. Egeland, supra,* 330 *N.J.Super.* at 192, 749 *A.*2d 372, the plaintiff sued the defendant for damages after allegedly suffering a herniated disc when the car in which she was riding

was rear-ended by the defendant's slow-moving vehicle. Liability was admitted and a jury trial was held as to damages only. *Ibid.* The defendant presented the testimony of a bioengineer who opined that the accident was so minor that it could not have caused the plaintiff's claimed injury. *Id.* at 193, 749 *A.2d* 372. The bioengineer relied upon a number of items in reaching this conclusion, including the accident report, photos of the defendant's vehicle, and a short video tape depicting a car crash dummy in an automobile being struck at five miles per hour. *Ibid.*

Following a jury verdict of no cause for action, we reversed, holding that the playing of this tape constituted reversible error because it had not been provided to the plaintiff in discovery, the judge failed to instruct the jury the tape was not substantive evidence, the tape was not properly authenticated by the bioengineer who merely assured that it was "internationally known," there were many differences between the crash test depicted on the tape and the actual accident, and the accident on the video was shown only in extreme slow motion which gave the impression of less movement and thus less impact.

In *Crispin v. Volkswagenwerk AG, supra,* 248 *N.J.Super.* at 547, 591 *A.*2d 966, the plaintiff-motorist was severely injured when his seat back collapsed following a high-speed rear-end collision, ejecting him out of the driver's seat to the rear seat of his 1971 Volkswagen Beetle. He sued the manufacturer alleging, among other things, defective seat design. *Ibid.* Following a jury verdict in the plaintiff's favor, the defendant appealed, arguing in part that the trial judge erred in restricting its use of certain video-tapes of crash testing performed by the National Highway Traffic & Safety Association on non-Volkswagens, and similar crash testing performed by the defendant on its own automobiles. *Id.* at 544, 556–57, 591 *A.*2d 966. We rejected this argument, finding there were too many variables between the tests and the evidence presented with regard to the subject accident to render them probative on any point raised. *Id.* at 556–57, 591 *A.*2d 966.

In *Macaluso v. Pleskin, supra,* 329 *N.J.Super.* at 348, 747 *A.*2d 830, the plaintiff's personal injury action sought damages for certain neck injuries she sustained as a result of an automobile accident. At trial, the judge permitted the jury to view, over the defendant's objection, a video entitled "Soft Tissue Animation," which was brought to court by the plaintiff's treating chiropractor and which was actually a compilation of drawings and animation accompanied by a narration. *Id.* at 349–50, 747 *A.*2d 830. Although he refused to admit the video into evidence because the chiropractor could not identify by whom it had been made, the judge accepted the chiropractor's representation that the video would serve as a visual aid to help the jury understand his testimony regarding the anatomy of the cervical spine and the injuries claimed by the plaintiff. *Id.* at 349, 747 *A.*2d 830.

Following a jury verdict in the plaintiff's favor, we reversed, finding the video was not a mere visual aid, but was instead testimonial in nature and contained much material that was not relevant to the plaintiff's injuries. *Id.* at 353, 747 *A.*2d 830. As such, and because the tape's contents were susceptible of being accepted by the jury as substantive evidence, we concluded a new trial was warranted. *Ibid.*

We find the video simulation in this case readily distinguishable from the videos deemed inadmissible in these cases. Unlike the video in *Suanez,* the video here was substantially similar to the subject accident, created by means of a process which was made known to the jury, provided to plaintiff in discovery, and shown in real time as well as in slow motion. Likewise, the video here differs from that in *Crispin,* in that it conformed with nearly all of the evidence surrounding the subject accident. Finally, unlike the video in *Macaluso,* the video here was authenticated and did not incorporate a testimonial component addressing extraneous information which could have potentially been used by the jury as substantive evidence.

The jury viewed the tape only once. Plaintiff's counsel was able to effectively cross-examine Nolte on the possible discrepancies

between the reconstruction and the actual happening of the accident. We have viewed the tape, including the real time and slow motion portions, and find it simple, straight-forward and not misleading. We find no error in allowing the jury to view it as an aid to Nolte's testimony. Although plaintiff also argues the trial judge should have provided the jury with a limiting instruction regarding the tape, no limiting instruction was requested and even now plaintiff does not identify what the contents of any such instruction should have been.

## IV

Plaintiff's remaining arguments are that the trial judge erred (1) by allowing defense counsel to pose improper cross-examination questions to him, (2) by precluding certain rebuttal testimony and (3) by allowing the defense to present evidence and make arguments regarding plaintiff's settlement of his 1986 accident case and the non-filing of a lawsuit regarding his 1993 motor vehicle accident. We find no abuse of discretion on these points, and find that these arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11–3(e)(1)(E).

Affirmed.

WECKER, J.A.D., concurring.

While I concur in the result, I write separately to express my disagreement with my colleagues' conclusion in Part III that the video simulation was "straight-forward and not misleading . . . . [and that there was] no error in allowing the jury to view it as an aid to Nolte's testimony." Op. at 18, 813 A.2d at 1229.

In my view, the tape was inadmissible for two reasons. First, although my colleagues recognize that Nolte disclaimed his ability or intention to depict "the force with which plaintiff's head struck the seat in front of him," Op. at 13, 813 A.2d at 1227, that is exactly what the video purports to show. Second, my colleagues also recognize that Nolte "conceded that the animation did not depict the effect on plaintiff's body of Barrentine's admitted

swerving just prior to the accident and he was unable to calculate the forces that were brought to bear on plaintiff's body." Op. at 14, 813 A.2d at 1227. Thus the video simulation gave the jury a visual picture of the direction and strength of the forces upon plaintiff's body (or the absence of such forces) without an accurate basis for that visualization.

Under other circumstances, the admission of this video simulation might be reversible error. Here, however, there was overwhelming evidence that plaintiff's complaints were either preexisting or exaggerated or both. I therefore find the error harmless and concur in affirming the judgment below.