# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3061-23

J.V.C.,[1]

    Plaintiff-Respondent,

v.

C.E.S.,

    Defendant-Appellant.

_____

Argued September 30, 2025 – Decided November 14, 2025

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1516-24.

Christine M. D'Elia argued the cause for appellant.

Lisa G. Nolan argued the cause for respondent (Klineburger and Nussey, attorneys; D. Ryan Nussey and Lisa G. Nolan, on the brief).

---

[1] We use initials to protect the domestic violence victim's privacy. R. 1:38-3(d)(10).

PER CURIAM

Defendant C.E.S. appeals from a May 22, 2024 final restraining order (FRO) entered against him and in favor of plaintiff J.V.C. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, as well as a subsequent May 22, 2024 order awarding attorney's fees in the amount of $7,805 to plaintiff. We have evaluated the record in accordance with controlling legal principles, and we affirm.

I.

On February 21, 2024, plaintiff obtained a temporary restraining order (TRO) against defendant after filing a complaint alleging the predicate act of domestic violence, harassment, N.J.S.A. 2C:33-4. She alleged "[defendant] called [her] over [sixty] times starting at 5:52 p.m. on [February 20, 2024] and ending at 7:26 a.m. on [February 21, 2024]" and repeatedly attempted to "find where [plaintiff] resides," and despite "being blocked ke[pt] calling, texting, and sending his location to [plaintiff] from other numbers." She alleged a prior history of domestic violence, specifically noting a September 13, 2023 incident when defendant prevented her from leaving his apartment and chased after her car as she fled and an October 18, 2023 incident when defendant showed up at

her office unannounced. Days later, plaintiff amended her TRO to include an alleged prior incident of domestic violence that occurred on August 28, 2023.[2]

The following facts and procedural history are derived from the FRO hearing record pertaining to the TRO obtained by plaintiff against defendant. The hearing commenced on March 20, 2024, and continued on April 1 and April 17, 2024. Plaintiff appeared with counsel and defendant appeared self-represented, and both testified at the hearing. Plaintiff presented records of electronic communications and testimony from her employer; defendant presented testimony from his nephew,[3] and a friend.

A. Plaintiff's Case

Plaintiff testified she and defendant met in November 2022, and the two dated for approximately eight months before the first time they broke up. Although they were not living together, plaintiff testified she "was at his apartment basically every day." She explained they first broke up after an incident on August 28, 2023, when defendant requested plaintiff pick him up

---

[2] On February 28, 2024, the date of plaintiff's amended complaint, defendant obtained a TRO against plaintiff alleging harassment, N.J.S.A. 2C:33-4. Defendant later dismissed his TRO, and that matter is not the subject of this appeal.

[3] The trial court in its findings referred to defendant's nephew as his "cousin." However, testimony reflects the witness was defendant's nephew.

from the gym, and she refused. She testified that when she went to defendant's apartment later that day, he confronted her and "[g]rabbed [her] neck" with one hand and, while holding her by the neck, warned, "When I ask you to pick me up, you go pick me up." She indicated this was the first time defendant ever physically "hit" or "grabbed" her.

Plaintiff described unsuccessfully trying to end the relationship. She presented a series of text messages from late August in which she texted defendant she would not "call[] back or answer[]" his calls, explaining she sent that message because she was "trying to get[] rid of . . . the relationship." According to plaintiff, defendant would contact her by text message and by phone call "beg[ging]" her to return his calls. She testified she texted defendant, "[Y]ou waste no time in saying hurtful things and asking me to leave. I won't tolerate this anymore. This is literally making me sick. My legs are shaking right now." Plaintiff explained she tried to "[b]reak up" with defendant, but he continued to text, call, and leave plaintiff voicemails as evidenced by phone call logs.

The court admitted the text messages into evidence over defendant's objection. Defendant argued the text messages appeared to be from "two different numbers" and some screenshots of the messages did not have dates.

A-3061-23

The court questioned plaintiff regarding the authenticity of the documents, asking her about the hand-written notations of dates on the screenshots. She explained that printed out screenshots of the text messages sometimes included the dates but sometimes did not, and therefore she handwrote the dates of the messages that were displayed on her phone. She testified defendant reached out through a second phone number after plaintiff attempted to "block his number." Plaintiff indicated she knew defendant had a second phone because he used both numbers to communicate with her when they were in a relationship and she recognized both phone numbers belonged to defendant. Plaintiff presented text messages from August 31, in which she advised defendant she was "worn out, getting depressed," their "relationship [wa]s over," she did not "want to talk," or "be in a relationship with [defendant] or anyone," and asked defendant to "accept [her] decision and stop trying."

Plaintiff further testified she again advised defendant by text message on September 4 she could not continue their relationship. Her message stated:

> After spending a lot of hours thinking, I decided to come back to my decision of ending this relationship. You said, "Don't let the Devil in," but maybe this is God showing me that I should stay away. This is just too much. I will always love you and G,[4] but I don't have

---

[4] "G" references defendant's son.

A-3061-23

enough mental health to deal with all of this, and now it's affecting my physical health.

She testified she texted defendant on September 13 reiterating she wanted to end the relationship, and he then texted and called her "tons" of times, and left voice messages telling her he would be coming to her apartment. Plaintiff responded "asking him not to come," but defendant ignored her request and showed up outside her apartment building. She refused to let him inside the building, but agreed to meet him outside and asked him to leave. Plaintiff recounted defendant refused to leave and asked to come inside to charge his phone, at which time she retrieved a phone charger from her apartment and allowed defendant to charge his phone inside her car. She testified that she waited inside the vehicle with defendant while he was charging his phone and "trying to kiss [her] and insisting . . . for [her] to come back to him."

She explained she ultimately agreed to drive him back to his apartment, "have a meal with him and take him to grab his medicine" if he agreed to leave. She then drove him home and accompanied him inside. She recalled defendant "laid on the couch and said that he finally understood that [plaintiff] didn't want anything to do with him. And because he had already lost the custody of his son, . . . he had nothing else to lose and he was go[ing to] kill himself." Plaintiff testified she immediately "ran to leave his house," but before she could reach

6

the door, he "got in front of the door, locked the door, put a bunch of things in front of the door and didn't allow [her] to leave." She testified defendant told her she was not allowed to leave as he attempted to "hug" her for ten minutes, pleading with her to drive him to get his medicine.

According to plaintiff, she eventually freed herself and ran to her car as defendant chased her on foot as she drove away. He caught up to her when she was stopped at a red light, "knocking on [her] car, yelling." When the traffic light turned green, she drove off and stopped to call the police. She recalled police responded, but she did not seek a restraining order that day because she was "afraid that [defendant] was go[ing to] kill himself."

Plaintiff testified she was "scared" but continued her relationship with defendant as she had in the past because she "felt trapped" and "[e]very time [she] tr[ied] to break up, he would find a way to [her]." Plaintiff conceded "there [were many] periods of time when the relationship resumed during the fall of 2023." Plaintiff testified they would break up and continue the relationship between August 2023 and February 2024, and that she "was trying to get out and he would come after [her]; he would call [her] insistently; text [her] insistently and [she] would end up coming back."

A-3061-23

She explained throughout October and November defendant continued to text her, but he "unsent" messages when "he would throw a threat or something bad." He shared his location on his phone and requested plaintiff share hers, threatening plaintiff that "he was go[ing to] come after [her]" and "was not go[ing to] give up." She indicated defendant emailed her, asking her to "unblock" his phone number. Plaintiff testified that she texted him, "Stop, just stop. I don't want you to worry about me. I don't want to be with you; I don't want to talk to you; I don't want to see you. Respect that; leave me alone." She recalled a time in October when defendant showed up at plaintiff's gym where he was not a member, and on October 31, he arrived at plaintiff's aunt's house where plaintiff was living.

Plaintiff presented an email from defendant dated December 18, "creating a Zoom meeting to talk to [her] because [she] wasn't answering his texts or phone calls." Plaintiff testified that defendant called and texted her "about [a] hundred times" and "show[ed] up at [her] place, . . . around [her] aunt's house, . . . [and] at [her] work." She played audio messages of defendant calling her and pleading with her to return his calls.

Plaintiff testified she ended the relationship in February after which defendant proceeded to call plaintiff "[c]lose to [seventy] times" using different

phone numbers, as reflected in her phone records. Plaintiff presented screenshots of notifications on her phone of defendant again "sharing his location" with her on February 20, 2024, when they were no longer in a relationship and without prompting. Plaintiff explained that she believed defendant called her again from a blocked number on February 27, 2024. She indicated she answered, but she did not hear anyone speaking on the other end of the line before ending the call. She explained she feared defendant and felt no way "to get away from him."

Defendant cross-examined plaintiff, at times inquiring about matters the court deemed irrelevant. Defendant posed confusing questions on topics including plaintiff's vacations, her mental health approximately eight years prior to her relationship with defendant, occasions when she would take off of work due to skin irritation, and whether plaintiff had restraining orders against another individual. The court frequently reiterated the purpose of cross-examination and requested defendant clarify his inquiry or proffer the relevance of his questions.

Plaintiff's employer testified he was familiar with defendant through plaintiff's photographs. He identified himself as a "defense contractor," and indicated plaintiff worked in the IT department in cybersecurity. He explained defendant appeared at their office on October 17 after defendant and plaintiff

9

had broken up. He recognized defendant as he entered the office building. He testified that he followed defendant into the building, introduced himself to defendant, and asked him to come outside with him. He asked defendant "why he was there," recalling defendant was holding flowers and responded that he wanted to "give the[m] to [plaintiff]." He described defendant as "talk[ing] in circles, not really making a whole lot of sense, . . . [and] his mannerisms were concerning." Feeling "uneasy," he asked defendant to leave, and defendant eventually left without seeing plaintiff. Plaintiff's employer indicated plaintiff told him defendant "w[as] not understanding that [he] wanted to break up[] or that she wanted to break up."

On cross-examination, defendant inquired whether plaintiff held another job, drawing an objection from plaintiff's counsel. Defendant highlighted plaintiff's employer was testifying about October 17, when plaintiff's complaint stated October 18. The court responded, "I fail to see how it is relevant to this case whether she has another job. If you are aiming at credibility because of some inconsistency in the filing, all right, that is something you have to pursue with her." The court sustained objections to defendant's attempted cross-examination, clarifying the "purpose of cross[-]examination" is to "undermin[e] . . . or show[] contradictions in the testimony." By way of

A-3061-23

example, defendant asked plaintiff's employer, "[W]ith IT and cybersecurity, do you—do you have access to networks when, wherever your device is or anything of, from the job entails an access to?"[5]  Plaintiff's counsel objected again to relevancy, and defendant responded it was relevant to "[u]nderstand[] the . . . details of the job."  The court directed defendant to "[a]sk another question and . . . move along."

B.  Defendant's Case

Defendant's nephew testified on his behalf.  The court led the questioning, expressing concern defendant did not understand the "rules of the road" but indicated it would then give defendant an opportunity to ask questions as well.  Defendant's nephew explained that on February 27, 2024, at approximately 6:30 p.m., he was on the phone with his friend and defendant discussing a camera for approximately fifty-seven minutes.  During the same time, plaintiff alleged she received phone calls from a blocked number.  Defendant's nephew admitted he was never in defendant's "physical presence" and had no "way to know if [defendant] was calling anyone else on any other devices."  He testified

---

[5]  Defendant's questions throughout the hearing were oftentimes incomprehensible, requiring the court to ask defendant to clarify.

he was not aware defendant had any other cell phone devices or phone numbers, aside from the phone defendant used to call him on February 27.

Defendant also presented the testimony of his friend of twenty years, who indicated he was present with defendant at the gym on August 28, 2023. According to defendant's friend, they were at the gym for "five [to] six" hours from 11:30 a.m. until 4:30 p.m. when he drove defendant back to his apartment. He recalled defendant told him plaintiff was "upset" that he and defendant were at the gym together.

Before defendant commenced testifying, the court advised plaintiff's counsel it intended to afford defendant "leeway" because he was "not trained in these things." Defendant immediately began his testimony, stating, "Well, one thing I just want to start with, you know, I don't think . . . plaintiff has met her burden," claiming plaintiff relied on "hearsay to these things even where some of the evidence has been provided had handwritten dates" and her witness's testimony contained "a lot of contradictions in his statements where he was."

The court explained defendant was "making an argument," which was not appropriate until after all evidence was presented. The court instructed defendant that he should "address the facts as [plaintiff] has laid them out" and should describe to the court what happened on each day plaintiff alleged

12

defendant harassed her. The court commented that it "would have thought [defendant] would have prepared some kind of outline . . . to guide [his] testimony." The court noted defendant was "shuffling back and forth between various piles of papers" and had his laptop open but did not appear to have organized his presentation in any way.

Defendant continued and denied plaintiff's allegations in their entirety. He testified he never "lock[ed] her in . . . the house" and never "show[ed] up anywhere unannounced." He also testified that he never called her from a blocked phone number, though he admitted he "did call . . . [to] ask [plaintiff] about [his] keys and [his] dog tags." He alleged plaintiff "work[ed] at [a] gentleman's club," that plaintiff had an FRO against her ex-husband, and that plaintiff had a skin irritation that was a result of her allergies to cats and dogs. The court questioned the relevance of defendant's claims and advised defendant he should "address the allegations [plaintiff] has made . . . in her testimony."

Defendant testified plaintiff suffered from anxiety and depression and was taking medication for her symptoms, and that she would "get[] upset when [defendant was] at the gym with [his] cousin" rather than with her. Defendant described plaintiff's "throwing out allegations saying that [he's] using my son or that [he] lost custody" as "very detrimental to [him]." Over plaintiff's counsel's

objection to defendant's offering arguments rather than testimony, the court indicated it would not "take anything as . . . testimony that's simply a commentary on somebody else's testimony," but allowed defendant to continue.

The court eventually asked defendant, "[H]ow much longer do you anticipate that you[] will be speaking?" and defendant responded that he had seventy pages of text messages he wanted to introduce. The court asked defendant to explain the intended purpose of those communications, and defendant responded that the messages would demonstrate plaintiff "willingly asking [defendant] . . . if she could come over." The court instructed defendant to "pull out ten pages that best demonstrate what [defendant was] seeking to demonstrate," and defendant responded, "I can do that." After an hour-long break, the parties returned, and defendant presented various text messages and read them into the record. By way of example, one text message conversation from November 2023 concerned plaintiff's "skin irritation" where, according to defendant, plaintiff said "something isn't sitting right in her skin at the house." Another conversation from weeks earlier referenced plaintiff's lip injections. After the text messages offered by defendant were read into the record, the court refused to allow defendant to introduce more text messages.

A-3061-23

C.  The Court's Decision

At the conclusion of testimony, the trial court rendered an oral decision and granted the FRO against defendant.  The court reviewed the evidence, including the call logs and screenshots of text messages supporting plaintiff's claim of a prior history of harassment, and recounted plaintiff's testimony regarding the incidents of domestic violence plaintiff alleged occurred on August 28 and September 13, 2023.

The court found plaintiff went to defendant's home on August 28, 2023, encountering defendant "upset" because plaintiff had not picked him up at the gym, and defendant "put[] his hands around her neck."  The court noted defendant's denying that he saw plaintiff that day and defendant's friend's testimony that he was with defendant.  However, the court determined the text messages from August 28 "confirm[ed] that . . . plaintiff did go to . . . defendant's home . . . that evening," and found defendant's friend's testimony that defendant told him plaintiff was upset they were at the gym together also suggested defendant and plaintiff were communicating by text message.  The court found "[defendant's friend] dropped [defendant] off at home, there was the further exchange between the parties culminating in . . . plaintiff going to his home," noting an exchange in which defendant

texted plaintiff "I'm home; I'm here."  The court characterized defendant's testimony that he did not see plaintiff that day as "untruthful[]," as it was contradicted by the evidence, "cast[ing] a serious shadow over [his] credibility on all matters in this case."

The court noted plaintiff "end[ed] the relationship" on August 31, as evidenced by the text message plaintiff sent to defendant, stating in part, "For me, our relationship is over.  Nothing that you say is going to change the fact that I want to be alone and the feelings I thought I had for you were not strong enough to keep investing in what we had. . . . Please accept my decision and stop trying."

The court determined defendant nevertheless persisted, citing text messages from September 4 when plaintiff "ended one exchange" by texting defendant that she "decided to come back to [her] decision of ending this relationship," that she did not "have enough mental health to deal with all of this and now . . . [it] [wa]s affecting [her] physical health."  The court reasoned plaintiff's communicating that she "decided to come back to [her] decision would suggest . . . that there had been some communications between the parties in the interim where [defendant] had been making some efforts to save the

relationship," yet plaintiff "was clearly, four days later, saying [she was] still . . . committed to ending the relationship."

The court acknowledged "there was some back and forth" from then until October 31, and defendant continued texting plaintiff and showing up to her aunt's home without plaintiff's permission. The court stated "there was a barrage of calls to [plaintiff] from . . . defendant's [phone] numbers," leading the court to conclude the calls were from "[defendant] trying to break through [plaintiff's] resist[a]nce." The court recognized between August 2023 through February 21, 2024, plaintiff "broke down and spoke to [defendant] or texted him," but attributed that contact to defendant's calls from blocked numbers and his "trying to break her will . . . [and] try[ing] to wear her out."

The court noted defendant continued to contact plaintiff after she obtained a TRO, calling plaintiff the following day from a blocked number. The court accepted defendant's nephew's testimony that he was on the phone with defendant at the same time plaintiff received the call from the blocked phone number, but concluded, based on defendant's prior calls to plaintiff from blocked phone numbers, the call was from defendant. The court further reasoned defendant's nephew "could not see what . . . defendant was doing" or "if he was

making any telephone calls" using one of the other devices defendant had "at his disposal while he was on the phone call [with] his [nephew]."

Thus, the court determined defendant "engaged in a campaign of harassment," defining harassment as "engaging in a course of action over [a] period of time . . . for the purpose of annoying or alarming the other party." It concluded defendant's "purpose in making all the phone calls, his purpose for saying the things that he said in text messages was . . . to wear [plaintiff] down." The court found defendant "was not going to accept plaintiff's decision that she did not want to be in a relationship with him." According to the court, "clearly there was harassment here, a continuing course of . . . harassment," finding the "choking [was] . . . an act of harassment itself."

Recognizing it is "not uncommon" in domestic violence cases for "a plaintiff [to] run[] hot and then cold," the court concluded defendant's "tactics . . . were so extreme that whatever minimal accommodations [plaintiff] may have made to him in speaking with . . . him, also having some contact with him over that time, is pale in comparison to his tactics, coming to her home," and her office in October 2023. The court found defendant "fail[ed] to heed the signals that . . . plaintiff was sending him," noting plaintiff's first obtaining the TRO against defendant did not prevent him from continuing to attempt to

18

communicate with plaintiff, and therefore, an FRO was "necessary to protect . . . plaintiff from future acts of domestic violence."

Finally, the court expressed concern for defendant's behavior throughout the course of the FRO hearing, stating it was "troubled by [defendant]'s presentation in court." Specifically, the court observed, "He . . . does not seem to be engaging in linear thinking. . . . I don't know if that is a psychiatric problem or [if] it is some . . . other condition, but I am concerned that . . . even if just one incident of putting his hands around someone's throat, if there is some mental health issue that needs to be addressed, it should be addressed as soon as possible." Consequently, the court ordered defendant undergo a mental health evaluation, which defendant does not challenge on appeal.

## D. Attorney's Fees

At the hearing's conclusion, plaintiff requested and the court granted her application for attorney's fees. The court clarified this would be "subject to submission of the usual papers." The court advised defendant if he had any objection to the award or the amount requested, defendant "must respond in writing to the court with a copy to [plaintiff's counsel] within ten days of your having received his . . . request," otherwise the court would "proceed on the application without consideration to what [defendant's] position might be."

19

On May 31, 2024, the court entered an order, indicating that on April 30, plaintiff submitted a "certification of fees and costs" associated with litigating the matter and defendant filed no objection or opposition. The court memorialized its decision awarding $7,805 in attorney's fees to plaintiff pending the outcome of this appeal.

II.

Defendant appeals arguing the trial court denied him the right to a fair trial, arguing the court improperly assessed credibility, erroneously found plaintiff established the predicate act of harassment and the need for future protection, and incorrectly awarded attorney's fees to plaintiff.

Our review of a family court's grant of an FRO is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). Indeed, the trial court's findings "are binding . . . when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We do "not disturb the 'factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by

20

or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms, 65 N.J. at 484). We may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D. v. M.D.F., 207 N.J. 458, 488 (2011). By contrast, we review de novo the trial court's legal conclusions. See T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024).

"We will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion," Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)), or "a clear error in judgment," Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010). Where a trial judge correctly applies the case law, statutes, and court rules governing attorney's fees, the fee award is entitled to our deference. Yueh v. Yueh, 329 N.J. Super. 447, 466 (App. Div. 2000).

A.

We first address plaintiff's claim that the court deprived him of a fair trial. He alleges the court "lost patience quickly with [defendant] and did not ensure his right to a fair trial," as the court "frequently stopped [defendant]'s questioning of witnesses, interrupt[ing] [defendant]'s testimony in his case in

21

chief, and severely limited his use of relevant exhibits in this case."  We disagree.  Our review of the record demonstrates the court allowed defendant ample leeway throughout the proceedings to challenge plaintiff's witnesses and evidence and present his own case.

Importantly, "[t]he conduct of a trial . . . is within the discretion of the trial court."  Persley v. N.J. Transit Bus Operations, 357 N.J. Super. 1, 9 (App. Div. 2003) (citing Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J. Super. 472, 492 (App. Div. 2000)).  N.J.R.E. 611(a) provides the trial judge broad discretion to control the "mode and order of interrogating witnesses and presenting evidence" to "determin[e] the truth," "avoid wasting time," and "protect witnesses from undue embarrassment."  The court's discretion will not be disturbed "unless there is a clear abuse of discretion which has deprived a party of a fair trial."  Persley, 357 N.J. Super. at 9 (citing Daisey v. Keene Corp., 268 N.J. Super. 325, 334 (App. Div. 1993)).

Due process encompasses the right to a fair hearing.  See In re Adoption of Child ex rel. M.E.B., 444 N.J. Super. 83, 88 (App. Div. 2016).  An essential component of a fair hearing is "an unbiased tribunal."  Nicoletta v. N. Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 164 (1978).  To this end, a judge must

exhibit "at all times . . . patience and understanding" and an impartial demeanor. In re Albano, 75 N.J. 509, 514 (1978).

We are satisfied the court adhered to these standards, in both form and manner throughout the proceeding, giving due consideration to defendant's self-represented status. The record reflects the court periodically interrupted and guided defendant, but we discern no instance in which the court did so for a purpose other than to reorient defendant, control the proceedings, remind defendant of procedure, or gain clarity when defendant's inquiries or testimony became confusing or appeared irrelevant. Defendant frequently launched into improper argument and irrelevant testimony, which the court properly found inappropriate and irrelevant to plaintiff's allegations against defendant, repeatedly reminding defendant to address plaintiff's allegations. Notably, however, the court's decision reflects its consideration of defendant's contention that plaintiff voluntarily participated in and even initiated some of their communications, a point defendant unpersuasively urges he was improperly restricted from making.

We similarly conclude the court's evidentiary rulings were appropriate and made to streamline defendant's questions, testimony, and evidence to relevant matters, in accordance with N.J.R.E. 403 (providing judges may preclude

23

presentation of evidence when its probative value is outweighed by the risk of "(a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence"). The court repeatedly allowed defendant the opportunity to adjust to the court's directions, and we perceive no improper impingement on defendant's rights by the court's attempt to harness defendant's questions and testimony that frequently ran afoul of the evidence rules. We also perceive no merit to defendant's claim that the court erred by admitting plaintiff's exhibits after plaintiff properly authenticated them during her testimony.

We next consider and find no error in the court's finding plaintiff established the predicate act of harassment and the need for permanent restraints to protect her from defendant. When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Upon a finding of a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at

126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

Initially, we are unpersuaded that the court erroneously credited plaintiff's account of events and found defendant's testimony not credible. Due regard is given to the trial court's ability to evaluate the credibility of the parties and the evidence presented. State v. Locurto, 157 N.J. 463, 470-71 (1999). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

Applying this standard, we conclude the court reasonably accepted plaintiff's account of the pertinent events. The court repeatedly tethered plaintiff's testimony to the parties' corroborating electronic communications. The court found defendant unbelievable and reasoned defendant's witnesses, although credible, did not support defendant's denials or refute plaintiff's evidence. The court recognized plaintiff often vacillated in attempting to end the relationship, but found this behavior consistent with the cycle of domestic violence and supported by the record. We will not disturb the court's veracity determinations which were firmly supported by the record.

We likewise determine the court thoroughly examined the record and reasonably found plaintiff established harassment based on sufficient credible evidence. To establish harassment under N.J.S.A. 2C:33-4, a person must act "with purpose to harass another" meaning that person:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Defendant contends the court erred in finding his conduct evidences the requisite intent to harass. The purpose to harass is often difficult to prove "and often must be inferred from what is said and done and the surrounding circumstances." R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

Here, the court disbelieved defendant's denials and found his barrage of communications were not benign in nature. The court found defendant's repeated texting and calling plaintiff and showing up to plaintiff's work after their relationship ended was done with the purpose to harass, annoy, and alarm plaintiff. That finding was well-rooted in the record. The court recounted the history of domestic violence and construed defendant's conduct as a part of a "campaign" to harass. The court referenced defendant's choking plaintiff on August 28, 2023, and preventing plaintiff from leaving his home on September 13, 2023, as evidence of his motivation. Accordingly, the court amply anchored its findings and provided its reasoning.

We likewise reject defendant's challenge to the court's conclusion that the FRO was necessary to protect plaintiff under prong two of Silver. The court found plaintiff's fear of defendant was objectively reasonable given the history of abuse and other credible evidence in the record. The court detailed the history, emphasized the prior instances of physical violence, noted the features of coercive control in defendant's conduct, and expressed concern over defendant's persistence and mental health. The court's finding of the need for future restraints was supported by the record, and we will not disturb the court's reasoned decision.

27

B.

Regarding defendant's challenge to the award of attorney's fees, the PDVA expressly includes reasonable attorney's fees as compensatory damages available to victims of domestic violence. N.J.S.A. 2C:25-29(b)(4). "The reasonableness of attorney's fees is determined by the court considering the factors enumerated in R[ule] 4:42-9(b)." McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007). Here, however, we need not address this issue as defendant presents no record to demonstrate he raised a challenge to the fee award before the trial court. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014). Defendant has similarly presented no evidence to support his claim of "undue hardship."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3061-23