NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2322-24

KAREN PASSERO and
LOUIS PASSERO, h/w,

    Plaintiffs-Respondents,

v.

LOUIS JACOBELLI,

    Defendant-Appellant,

and

ANNAMARIE JACOBELLI,

    Defendant.

_____

        Argued April 13, 2026 – Decided June 26, 2026

        Before Judges Sabatino, Walcott-Henderson and Bergman.

        On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1573-22.

        Robert J. Gallop argued the cause for appellant (O'Toole Scrivo, LLC, attorneys; Robert J. Gallop, Lisa M. Lazzaro, and Emily Lagg Gonzalez, of counsel and on the briefs).

Corey A. Dietz argued the cause for respondent (Brach Eichler, LLC, attorneys; Edward P. Capozzi and Corey A. Dietz, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal concerns a negligence action brought by plaintiffs Louis and Karen Passero against defendant, Louis Jacobelli, after Karen Passero severely injured her back while on defendant's boat. While the parties were traveling to a fishing spot, a larger vessel passed defendant's boat, leaving a wake, or two waves, that struck the boat. As a result of the impact, Karen,[1] who was sitting on the bow, was launched out of her seat twice and landed on the boat's floor. It is undisputed that Karen fractured her thoracic spine.

Plaintiffs contend defendant was negligent in his operation of the boat and presented testimony at trial by a boating expert in support of that contention. Plaintiffs also presented expert medical testimony from an orthopedic physician through a video-recorded de bene esse deposition.

---

[1] For clarity, we refer to Mrs. Passero by her first name or as "plaintiff" unless the context indicates otherwise. Additionally, because Louis Passero and Louis Jacobelli share a surname, we will refer to Louis Passero by his first name and Louis Jacobelli with his party designation of "defendant." No disrespect is intended.

2

The jury found defendant fully liable for the injury, awarding damages to plaintiffs that, with interest and fee-shifting, resulted in a judgment of nearly $1 million.

Defendant now appeals both the liability and damages awards. He contests the trial court's pretrial rulings that had allowed a late amendment to plaintiffs' medical proofs eleven days before trial, denied him an extension of discovery to obtain responsive medical evidence, permitted a surprise demonstrative aid to be used at the de bene esse deposition of plaintiff's doctor without reasonable advance notice, and denied his motion to bar alleged net opinion by the boating expert.

For the reasons explained in the published portion of this opinion, we vacate the damages awarded without prejudice. We do so because the trial court misapplied its discretion in denying the defense a fair extension of discovery to respond to plaintiffs' brink-of-trial medical evidence, which materially changed the perceived severity and progression of the back injury.

Although it is not separate grounds for reversal, we also disapprove of plaintiffs' failure to provide reasonable advance notice of an illustrated "storyboard" presented for the first time at their medical expert's de bene esse

3

deposition. We refer that notice issue to the Civil Practice Committee for its prospective consideration.

In the unpublished portion of our opinion, we affirm the trial court's denial of defendant's motion to bar plaintiffs' maritime expert, and we therefore affirm the liability portion of the verdict. A new trial on only damages is warranted.

I.

The following relevant background of facts and procedural history is presented by the record.

The Boating Accident

On May 28, 2022, plaintiffs visited their long-time friends—defendant and his wife Annamarie Jacobelli—on Long Beach Island for Memorial Day weekend. Defendant had received a certificate in boating safety during the 1990s. In 2021, he purchased a twenty-foot angler boat. Defendant had piloted plaintiffs on the boat without incident that same year. On the date of the accident, defendant again piloted the boat to take five passengers (plaintiffs, Annamarie, Louis Passero's cousin, and the cousin's wife) on a fishing trip through Barnegat Bay. Annamarie was seated next to defendant in the cockpit of the boat, Louis was also seated in the stern of the boat next to the engine, and Karen along with the cousin and his wife sat in the bow. While the boat was

moving, Karen held on to a railing near her spot on the bow.

Both plaintiffs and defendant described the weather as clear and sunny. The bay was busy with boating traffic, likely due to the holiday weekend.

At some point during the trip to the fishing spot, defendant told Louis the boat was traveling twenty-seven miles per hour. Defendant testified at his deposition that immediately before the accident, the boat was traveling twenty-two miles per hour.

While traveling to the fishing spot, defendant noticed a larger vessel traveling, and creating a wake, parallel to the port side of his boat. At trial, defendant testified that as the wake approached, he slowed his speed to one-to-two miles per hour and turned the boat to approach the waves at a forty-five-degree angle. To the contrary, Louis testified that he did not feel the boat slow as it approached the wake.

When the boat was struck with the first wave of the wake, Karen was launched from her seat, despite holding on to the railing. As she went airborne, she heard someone towards the cockpit of the boat yell for the other passengers to "hold on."

Karen landed back on the seat, hitting her tailbone. Moments later, the second wave of the wake struck the boat and she was launched in the air again.

A-2322-24

This time, she landed on her back on the floor of the boat. Karen testified that she felt a tingling sensation and, then, "excruciating pain."

Plaintiff's Injuries and Medical Care

After Karen was injured, defendant brought the boat back to shore and she was driven to a local hospital. The hospital took x-ray photographs of her back and discharged her with pain medicine.

The pain did not subside and Karen was unable to walk for roughly four days. Five days after the accident, plaintiffs visited an orthopedist, who reviewed the x-rays and determined that Karen had fractured the thoracic vertebrae in her back.[2]

As a result of the fracture, Karen had to wear a back brace for three months. She was unable to return to her job as a hairdresser for five months. For the first month after the accident, she could not walk without a walker, could not perform household chores and relied on Louis to help her shower and use the bathroom. At the time of trial, she testified that the injury caused her pain every day and that she still substantially relied on Louis, although she had

_____

[2] The specific fracture in question was a T-11 burst fracture with retropulsion. "Retropulsion" refers to "a pushing back of any part." Stedman's Med. Dictionary, 1686 (28th ed. 2006). Essentially, when Karen's vertebrae broke, fragments of her spine were pushed back towards her spinal cord.

A-2322-24

returned to work and most normal life activities.

This Lawsuit

In September 2022, plaintiffs filed a complaint in the Law Division against defendant, Annamarie,[3] and fictitious parties (likely referring to the unidentified larger vessel[4] that had passed defendant's boat), for negligence, as to Karen, and loss of consortium, as to Louis.

Medical Treatment and Dr. Giordano's Trial Testimony for Plaintiffs

When Karen was first injured, she was initially treated by an orthopedist, Jennifer Gyi, D.O., who diagnosed the fracture. However, Dr. Gyi referred her to an orthopedic surgeon, Carl Giordano, M.D., for further treatment and to explore the possibility of surgery.

Dr. Giordano examined Karen for the first time on August 2, 2022, and told her "only time would tell" if further intervention would be necessary to stop future pain or deformity. While no major changes to her condition were noted on the second examination, August 20, 2022, the third time Karen was examined by Dr. Giordano on January 23, 2023, he noted that "[thirty-eight] degree

---

[3] Annamarie was dismissed from the lawsuit, with prejudice, in August 2023.

[4] The owner or operator of that passing vessel was never identified.

7

kyphosis"[5] had developed across the fracture in her spine and that "only time would tell what kind of symptoms she would be left with long-term."

On April 4, 2023, the fourth time Karen was examined, Dr. Giordano noted that the kyphosis had increased to forty-five degrees and recommended that "at this time, she should start to consider surgical correction of the deformity."

Dr. Giordano's first expert report, dated April 21, 2023, concluded that although surgery was recommended, Karen did not know at the time if she wanted to undergo the procedure or continue with more conservative, pain management measures. Furthermore, he opined that her pain was generally improving and she would likely be left with limitations "with or without surgery."

At her deposition on August 13, 2023, Karen mentioned that, to prevent further pain from the injury, Dr. Giordano had recommended a surgery involving "a lot of plates and screws" and that she "didn't get like a lot of details from it." At the time of that deposition, Karen said, at the moment, she was "dealing with" the pain from the fracture but "if it [got] worse [she] would have to consider"

---

[5] "Kyphosis" refers to either a forward or concave "curvature of the spine." Stedman's Med. Dictionary, 1036 (28th ed. 2006).

the surgery.

Notably, for reasons not apparent from the record, defendant did not request to have a medical expert of his own conduct an Independent Medical Examination ("IME") of plaintiff during the discovery period. At the appellate oral argument, defense counsel represented to us that there had seemed to be no need for an IME because causation of the injury was not disputed and Karen appeared to be making a full recovery.

### Dr. Giordano's Updated January 2025 Medical Exam and New Expert Report

Nearly two years passed after Dr. Giordano's initial report and Karen's deposition. Then, on January 14, 2025, a little under a month before the scheduled trial date of February 11, 2025, Dr. Giordano examined Karen again for the first time since 2023. That same day, the doctor opined in a new report that Karen "had failed all forms of conservative care" and had elected to proceed with the surgery, a "posterior reduction and instrumented fusion across the fracture."

On January 30, 2025—twelve days before the scheduled February 11 trial date—plaintiffs moved to amend their previously answered interrogatories to

address Karen's decision to proceed with the surgery.[6] Plaintiffs' counsel certified that this information was not discoverable through due diligence prior to January 30, 2025. By this point, the Discovery End Date ("DED") had long expired.

In response to this brink-of-trial request, defendant moved to bar the amendment or, in the alternative, extend discovery for 180 days "for exceptional circumstances."

Additionally, plaintiffs moved to amend their interrogatories to include the new report, dated January 30, 2025, of a second medical expert, Richard S. Nachwalter, M.D., who they anticipated would be performing the spinal fusion surgery. Dr. Nachwalter's report stated that he had recommended surgical correction of Karen's spine, but through the front of her body, and that this would be a major procedure. Defendant likewise moved to bar this additional late medical report.

---

[6] It was represented to us that plaintiffs did amend their interrogatory responses several times after April 2023 to reflect ongoing treatment by Dr. Gyi, although copies of those materials were not supplied in the appellate appendices. It is undisputed, however, that Karen was not examined by her orthopedic surgery expert, Dr. Giordano, between April 2023 and January 2025, and no expert reports from Dr. Giordano during that interval were provided.

<u>Dr. Giordano's De Bene Esse Testimony</u>

Dr. Giordano's de bene esse testimony for the trial was video-recorded on February 4, 2025, eight days before the start of the trial testimony. Defendant had apparently elected not to depose Dr. Giordano during discovery and therefore, the de bene esse testimony was the first and only time the doctor was questioned by defense counsel.

During his recorded testimony, Dr. Giordano described how a surgeon would cut open Karen's back and implement bone grafts[7] along the fracture to heal it and straighten her spine. The surgeon would drill screws and rods into the spine to straighten it until the bone grafts fully healed.

<u>The "Demonstrative Aid" Storyboard (Exh. P-7)</u>

During the de bene esse testimony, plaintiff's counsel presented to Dr. Giordano a case-specific, color diagram or "storyboard" of the surgery titled "Karen Passero, T10 to L2 Posterior Thoracic Lumbar Spine Fusion" identified as "P-7." The exhibit consisted of multicolor illustrated boxes detailing the steps of the surgery accompanied by written explanations. The storyboard had not

---

[7] The doctor described "bone grafts" as bone fragments taken from another part of the body that can be mixed with a protein to "stimulate the [spine fracture] to heal."

been shown to defense counsel—nor its existence disclosed—before the day of the deposition.[8]

Notably, Dr. Giordano explicitly referred to the illustrations in P-7 when explaining the surgery such as in the following exchange:

> Q: Doctor, does P-7 exhibit the steps of the surgery that you explained to Ms. Passero on April 4th of 2023?
>
> A: Yes.
>
> Q: Now, you also saw her just recently in January 14th of 2025. Is this the same surgery you would have also recommended at that time?
>
> A: Yes.
>
> Q: Doctor, P-7 in front of you this is the surgery that you recommended on April 4th of 2023, right?
>
> A: Yes, this is a good reflection of the exact models that we have in every examining room in our office.
>
> Q: And you went over these models with Ms. Passero?
>
> A: Yes. I never talk to a patient about screws and rods in their back without showing them on a model because they don't particularly understand it hearing it. But they understand it seeing it.

---

[8] An invoice in the record reflects that plaintiffs' counsel received copies of the storyboard from a vendor on or about January 30, 2025, approximately five days before the recorded deposition. The invoice amount was over $1000.

Dr. Giordano proceeded to explain, in detail, the steps of the surgery portrayed by each illustration on P-7.

Defense counsel objected to the introduction of P-7 during Dr. Giordano's testimony because it had not been produced during discovery. Defense counsel asserted the storyboard was "not a demonstrative exhibit," but "apparently exhibiting what the actual surgery is going to consist of." Because he did not yet know during the recording of Dr. Giordano's testimony whether his objection to the late expert report would be successful, defense counsel cross-examined Dr. Giordano on the new information, focusing on questioning the necessity of surgical intervention.

Marine Liability Expert's Report and Deposition

To establish the standard of care for piloting a boat, plaintiffs produced Captain Hendrick Keijer, a "[m]aritime industry veteran with more than [twenty-five] years' experience onboard in Officer and Captain roles."

In his expert report served to defendant on April 11, 2024, Capt. Keijer opined that defendant had violated the standard of care by allowing Karen to sit in the bow of the boat. In his report, Capt. Keijer cited multiple sources for the proposition that "persons seated in the bow of a vessel are subject to the increased risk of being thrown in the air from their seats when an operator fails

13

to slow down during a wake encounter." He referred in this regard to seating recommendations from the American Boat and Yacht Council ("ABYC"), which were published by the U.S. Coast Guard.[9]

The captain explained that persons in the bow were placed at a higher risk of injury because "the bow . . . of a vessel can be lifted up violently and slam back down, impacting the water, and forward seated passengers can be lifted from their seat and come back down hard with the potential of resultant injury." To support the proposition that a wake should be encountered at "low speeds," Capt. Keijer cited to a treatise titled "Chapman Piloting and Seamanship."[10]

Capt. Keijer opined that Karen's injury indicated that defendant had been piloting the boat at an unsafe speed. He noted that, according to the "New Jersey State Police Boating Safety Manual":

> No person shall operate a power vessel or allow a power vessel to be operated where the speed may cause danger of injury to life or limb or damage to property. The speed of every power vessel shall be regulated to avoid

---

[9] ABYC Occupant Protection Committee Recommends Designating On-Plane Seating Locations, U.S. Coast Guard Boating Safety Circular (1993) https://uscgboating.org/library/boating-safety-circulars/bscscan75c.pdf#ABYC.

[10] Chapman Piloting and Seamanship, 429 (67th ed. 2013).

14

risk of damage, or injury by any means, from the power vessel's wake.[11]

In his report, Capt. Keijer concluded that defendant had failed to abide by the standard of care for a boating captain and caused Karen's injury by "failing to slow his vessel down to a safe speed" and placing her in the "unreasonably dangerous" position of the bow during a busy boating day.

During the captain's deposition, defense counsel questioned him extensively about his conclusions regarding the speed of the vessel and his conception of what an unsafe speed was. When asked by defense counsel whether, hypothetically, one mile per hour could be an unsafe speed, Capt. Keijer responded, "[i]f the speed of a vessel results in the injury of somebody onboard and then if the cause indeed is that speed, then that would be an unsafe speed."

Defense counsel further pressed Capt. Keijer on what a numerical "safe speed" would be for defendant's vessel. The captain responded that what constitutes a safe speed is "situational" and "typically not detailed in manuals" for the related vessel.

---

[11] New Jersey State Police Boating Safety Manual, Operator Responsibilities: Speed, 31 (last visited Apr. 2, 2026) https://www.nj.gov/njsp/info/pdf/marine/021606-boating-safety-manual.pdf.

Based on his experience piloting vessels of a similar size, the captain opined that twenty-two to twenty-seven miles per hour would be what is known as a "planning speed" that is too fast for encountering a wake. Again, defense counsel asked Capt. Keijer to specify a numerical, miles per hour speed that would be unsafe for the vessel, Capt. Keijer adamantly responded:

> There's no definition of unsafe speed. I cannot put a particular . . . comes down to experience, knowing the boat, which this operator did. He knew the area. He was visually able to identify the wake that he encountered and going [twenty-two], [twenty-seven] miles an hour he needs to then be slowing down. With that bow, the result of that bow flipping up and ejecting a passenger in the bow area is an unsafe speed.

The captain noted that Karen's position in the bow was unsafe because of the size of the wake and the speed of the vessel. However, given that the boating conditions on the day were otherwise "favorable," it would not have been unsafe for her to sit in the bow if defendant had been piloting the boat at a safe speed or the wake encountered was very small, such as the wake of a jet ski.

Because the passing vessel was larger, Capt. Keijer opined it created a large wake, which defendant could have and should have spotted in time to relocate Karen from her seated position.

Defendant did not move for summary judgment after Capt. Keijer's deposition and report. However, on February 10, 2025—one day before the trial

16

date—defendant notified counsel for plaintiffs that he intended to move in limine to bar Capt. Keijer's testimony.

Disposition of Pre-Trial Motions

On February 11, 2025, the trial court conducted a pretrial conference. The court first addressed defendant's motion to bar the amended testimony of Dr. Giordano. Defendant argued that the January 14 report was a "dramatic new amendment" that Karen had elected to proceed with the major surgery and requested that the testimony either be barred or that discovery be extended so defendant could independently examine her. Plaintiffs responded that the new report conveying Karen's decision to go through with the surgery was not a new medical opinion, because the prior expert reports had revealed the surgery was recommended and documented Karen's condition was "deteriorating worse and worse and worse." Plaintiffs also emphasized that, although Dr. Giordano had recommended the surgery in 2023, defendant had elected not to retain his own medical expert. Plaintiffs further asserted that any potential prejudice to defendant had been "cured" because defendant had cross-examined Dr. Giordano about the surgery earlier that week during his de bene esse testimony.

The trial court ruled that plaintiffs had acted with due diligence in amending the interrogatories. The court perceived that Karen's decision to

proceed with the surgery was not indicative of a new opinion, because Dr. Giordano's previous expert report had documented that her kyphosis was worsening, thereby making the need for surgery more likely. The court also found that defendant was not prejudiced because Dr. Giordano had been cross-examined at his deposition about the new report. Accordingly, this motion in limine was denied.

Next, after brief argument, the court granted defendant's motion to bar the testimony of Dr. Nachwalter. The court noted that additional witness had never been named in any pretrial information as a potential expert and, furthermore, his expert opinion diverged in certain respects from that of Dr. Giordano's.

Finally, defendant moved to bar Capt. Keijer's testimony on the basis of it being a net opinion. Defendant asserted that Capt. Keijer's opinion that defendant was operating the boat at an unsafe speed was unsupported by any professional standards because he could not identify a specific, numerical speed that would have been safe to encounter the wake, and defendant had testified that he had slowed his speed as he approached the wake.

Defendant further argued that Capt. Keijer's opinion on the risk of Karen being seated near the bow was also dependent on the speed of the vessel.

18

Defendant maintained that Capt. Keijer's determinations on speed were based on nothing but the captain's personal views and were a "classic net opinion."

Plaintiffs countered that defendant's motion was procedurally improper because, to prove defendant's negligence, marine expert testimony was required, and barring plaintiffs' sole liability expert from testifying would be tantamount to an improper late motion for summary judgment. Plaintiffs also argued that defendant was "cherry picking" Capt. Keijer's testimony and that there was conflicting testimony from the lay witnesses as to whether defendant had slowed his boat as he approached the wake. Plaintiffs asserted that, because of Karen's injuries, defendant was "clearly going too fast" even if the captain did not identify a specific speed that would have been safer. Plaintiffs further noted that Capt. Keijer had cited several manuals as well as his own professional experience to support his opinion in his report.

The court determined that boating was "not within the common knowledge of the jury" and that plaintiffs needed to provide expert testimony to meet their burden of proving defendant's negligence. Because defendant's motion in limine, therefore, was essentially a motion for summary judgment, the trial judge determined it was filed "way too late" and was procedurally barred. In addition, the court also found that the motion could be denied on its merits, because there

19

was conflicting testimony on defendant's speed and Capt. Keijer had supplied the standards on which he based his opinions.

The next day, before the trial testimony began, defendant also moved to exclude the use of P-7 as a demonstrative exhibit. The court agreed that the storyboard was "misleading" because its wording falsely implied the surgery had already happened. In addition, the words on the storyboard were superfluous because Dr. Giordano explained how the procedure would be performed in his testimony. Plaintiffs offered to remove the written text on the storyboard and use only the illustrations as a demonstrative supplement to the doctor's testimony describing the procedure. The court agreed with this plan and allowed the redacted version of P-7 to be displayed as a demonstrative exhibit.

The Jury Trial

The jury trial took place over three days in February 2025. Both plaintiffs, defendant (as an adverse party), Louis's cousin, and Capt. Keijer testified in plaintiffs' case. In addition, Dr. Giordano's de bene esse testimony was played for the jury.

Louis and the cousin both testified that they did not feel the boat slowed significantly from its planning speed as the wake approached.

As we noted above, defendant testified at trial that, as the boat approached the wake, he slowed it from twenty-two miles an hour to "a mile an hour, two miles." Annamarie, defendant's only witness, testified that defendant did decrease his speed as the boat hit the wake but she could not determine by how much.

Both Karen and the cousin testified that the warning to "hold on" was given only seconds before the first wave of the wake hit the boat.

After he was admitted without objection as an expert in "Marine Operations and Investigations," Capt. Keijer's testimony at trial generally mirrored his deposition testimony. Of note, the captain questioned the credibility of defendant's testimony that he had decreased his speed to one mile per hour and opined "one mile an hour would, in all probability, result in a loss of steerage" meaning defendant could not encounter the wake at a forty-five-degree angle as he had testified. The captain also testified that at one mile per hour, "an occupant seated in the bow will not be catapulted out of her seat on two occasions."

Capt. Keijer compared the effect of encountering a wake too fast to going over a speed bump too fast in a car and opined that it would subject the bow to a higher "impact force" that could result in a passenger being launched in the

21

air. Capt. Keijer also testified that the bow was an unsafe seating position when encountering a wake because, as the first part of the boat to get hit by the wake, it is "subject to the greatest vertical accelerations and decelerations."

Capt. Keijer opined that, according to the ABYC standards, sitting in the bow of a boat is never recommended while the vessel is planning, and that at twenty-two miles per hour, a vessel such as the one involved here would be considered to be at planning speed. Citing to a publication on the effects of shock on the human body in a boat, the captain elaborated that a person getting ejected from their seat, as Karen was here, is a "well known effect" when "wakes are transversed or a wake is transversed at a high speed."

As he did at his deposition, the captain emphasized that there is no definite numerical "safe speed" and that what is a safe speed on the seas is situational. Capt. Keijer again pointed to the definition of "safe speed" in the New Jersey State Police Boating Safety Manual and opined that if a passenger was injured while a boat was traveling, the boat was traveling at an unsafe speed.

In addition to his opinion that defendant was piloting the boat too fast, Capt. Keijer also noted that, according to all witnesses, the fair boating weather meant the wake was visible to defendant from a thousand feet away, giving

22

defendant ample time to give an earlier oral warning to hold on, slow his speed, or move Karen from the bow into a safer area near the stern.

On cross-examination, defense counsel again questioned Capt. Keijer vigorously about his inability to provide a specific numerical speed that would be considered "safe."

Defendant's Motion for a Directed Verdict

After Capt. Keijer testified, plaintiffs rested their case and defendant moved for a directed verdict. The court orally denied the motion. It did so because, even though Capt. Keijer never cited a specific safe speed, his testimony helped the jury understand that the captain of a boat must slow down when approaching a wake, and several witnesses testified defendant did not slow down at all. Furthermore, the court noted that, apart from critiquing the boat's speed, Capt. Keijer had also testified that defendant, upon spotting the wake, had ample time to provide an earlier warning or to move Karen to a safer part of the boat.

Summations

During his closing argument, plaintiffs' counsel underscored to the jury that defendant had presented neither a marine liability expert nor a medical expert to rebut plaintiffs' own experts. Defense counsel twice objected to this

argument, but the court overruled it. Plaintiffs' counsel rhetorically asked, "Why didn't they call a doctor? Why didn't they call a marine expert?" Counsel urged the jurors to "[a]sk yourselves that when you're deliberating." Plaintiffs' attorney also replayed the portion of Dr. Giordano's testimony in which he had used P-7 to explain the steps of the recommended spinal fusion surgery.

The Verdict

The jury unanimously found that defendant was negligent in the operation of his boat and that this negligence caused Karen's injury and Louis's loss of consortium. They also unanimously found that Karen had not been negligent at all.

Karen was awarded $500,000 in compensatory damages and Louis was awarded $292,000 in loss of consortium damages. Added to those sums were attorney fees shifted under the offer of judgment rule, R. 4:58-1, and pre-judgment interest, yielding a total amount of $954,120.53.

This appeal followed. Defendant argues that, as a result of the trial court's erroneous rulings, he was deprived of a fair trial on both liability and damages.

II.

We first address the cluster of damages-related issues associated with the brink-of-trial service of Dr. Giordano's updated expert report and accompanying

radiology study, and plaintiffs' use of the previously undisclosed storyboard at his de bene esse deposition.

Certain principles of civil discovery and evidence guide our analysis. The general objective of our discovery rules is to advance "the public policies of expeditious handling of cases, avoiding stale evidence, and providing uniformity, predictability and security in the conduct of litigation." Zaccardi v. Becker, 88 N.J. 245, 252 (1982). The rules are "designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments rest upon real merits of the cause and not upon the skill and maneuvering of counsel." Abtrax Pharmaceuticals, Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 512 (1995) (quoting Oliviero v. Porter, 241 N.J. Super. 381, 387 (App. Div. 1990)).

Similar goals of fairness and merits-based outcomes are embedded in our rules of evidence. The evidence rules "shall be construed to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." N.J.R.E. 102; see also State v. Burris, 145 N.J. 509, 533-36 (1996) (reinforcing the goals of N.J.R.E. 102).

A.

As we noted, the issues presented here concerning Dr. Giordano's medical testimony arose after the discovery period had long ended.[12]

The motion practice was sparked by plaintiffs' January 30, 2025, service of Dr. Giordano's supplemental expert report dated January 14, 2025 along with the associated recent radiology study of Karen's spine. The report was based on Dr. Giordano's examination of plaintiff on January 14, 2025, which took place less than a month before the scheduled trial date. In addition, plaintiff sought to extend discovery to allow the use of the report and opinions of her intended surgeon, Dr. Nachwalter, as set forth in his expert report dated January 29, 2025.

Plaintiffs required the court's permission to make use of these last-minute medical proofs through an extension of discovery. In general, "[n]o extension of the discovery period may be permitted after an arbitration or trial date is fixed unless exceptional circumstances are shown." R. 4:24-1(c) (emphasis added); see also Rivers v. LSC P'ship, 378 N.J. Super. 68, 79 (App. Div. 2005). To demonstrate such exceptional circumstances, the movant must establish:

> (1) why discovery has not been completed within time and counsel's diligence in pursuing discovery during that time; (2) the additional discovery or disclosure

---

[12] At the hearing on plaintiffs' motion to extend discovery, defense counsel stated that 752 days of discovery had occurred.

sought is essential; (3) an explanation for counsel's failure to request an extension of the time for discovery within the original time period; and (4) the circumstances presented were clearly beyond the control of the attorney and litigant seeking the extension of time.

[Rivers, 378 N.J. Super. at 79.]

If it chooses to extend discovery based on such a showing, the trial court "may include such other terms and conditions as appropriate." R. 4:24-1(c).

Our scope of review on appeal of such discovery and case-management rulings by trial judges is generally deferential. DiFiore v. Pezic, 254 N.J. 212, 228 (2023). However, we are empowered to take corrective action if the court's discretion has been misapplied, and its ruling is "clearly capable of producing an unjust result." R. 2:10-2. See, e.g., DiFiore, 254 N.J. at 238 (holding that the trial court's ruling on a discovery issue reflected such a misapplication); Parkinson v. Diamond Chem. Co., 469 N.J. Super. 396, 411 (App. Div. 2021) (similarly remedying a misapplication).

The trial court here appropriately exercised sound judgment in denying plaintiffs' request on the eve of trial to expand discovery to enable the use of testimony by Dr. Nachwalter. The record did not establish the requisite extraordinary circumstances under Rule 4:24-1(c) to justify the inclusion of that brand-new additional medical expert. Dr. Nachwalter had never been identified

by plaintiffs in their interrogatory answers as a potential expert witness. He had not issued a previous report, and the surgery that plaintiff declared that she was planning to have Dr. Nachwalter perform had not yet occurred. The court rightly showed concern for the prejudice to defendant in denying that application. Plaintiffs did not seek interlocutory appellate review of that denial and have not provisionally cross-appealed it.

The trial court erred, however, in its disposition concerning the update by Dr. Giordano, perhaps because of a mistaken impression of what that doctor had previously opined. Dr. Giordano's initial expert report was issued on April 21, 2023, about a year-and-a-half before the February 2025 trial. That report, as we noted above, concluded that although surgery was recommended, Karen did not know at the time if she wanted to undergo the procedure or preferred instead to continue with more conservative pain management measures. Furthermore, Dr. Giordano opined in April 2023 that her pain was generally improving, and she would likely be left with limitations "with or without surgery."

As we also noted above, at her deposition in August 2023, Karen stated that, to prevent further pain from the injury, Dr. Giordano had recommended a surgery involving "a lot of plates and screws" and that she "didn't get like a lot of details from it." At the time of that deposition, Karen said, at the moment,

she was "dealing with" the pain from the fracture but "if it gets worse [she] would have to consider" the surgery.

Based on Dr. Giordano's extant report and plaintiff's deposition, it was conjectural whether plaintiff would benefit sufficiently from ongoing conservative care to avoid the need for surgery. It was not until January 2025, with the trial looming, that plaintiff was re-evaluated and it was determined that conservative care had not resolved her condition and that she was finally intending to proceed with surgery.

The trial court exercised appropriate discretion in extending discovery and allowing the updated opinions of Dr. Giordano to be presented at trial. The alternative would be for plaintiff and Dr. Giordano to present, in essence, a fictional account of her current condition, or to avoid that topic altogether and arbitrarily truncate her medical proofs chronologically. Adopting that alternative would thwart the search for truth.

That said, the trial court misapplied its discretion in depriving defendant of a fair chance to respond to the updated medical evidence with an extension of discovery. Such an extension would enable defendant to arrange for an IME of plaintiff in her current condition and then generate a possibly competing expert report that might have disagreed with Dr. Giordano's prognosis. Plaintiff,

29

in turn, would presumably be allowed to depose that defense expert. Defense counsel's request for a 180-day extension of time to accomplish those steps, under the circumstances, was manifestly reasonable. That would mean, of course, a postponement of the trial, but it would be a justified delay.

We reject plaintiffs' suggestion that defendant waived his right to have an IME and medical report because he had not previously pursued such discovery. The impetus of plaintiffs' post-discovery motion was that Karen's back injury had materially worsened (or at least failed to improve sufficiently) and that she was now expected to undergo surgery. The change of circumstances was relevant to the litigation interests of both sides. There was no waiver by the defense in the circumstances presented. Waiver is a "voluntary and intentional relinquishment of a known right" evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based. Sroczynski v. Milek, 197 N.J. 36, 63-64 (2008) (Rivera-Soto, J., concurring) (quoting Knorr v. Smeal, 178 N.J. 169, 177 (2003)). That unconditional relinquishment did not occur here.

We also discern from the record that the error in denying the defense a reciprocal discovery extension was harmful. As we noted above, plaintiffs' counsel urged the jury to hold it against defendant that he had not presented an

opposing medical expert. But the jury was not told that defendant had tried to get the court's permission to retain such an expert after the most recent medical studies and had been denied that opportunity. The jury was then left with a misleading and one-sided impression.

The situation here is comparable to Bender v. Adelson, 187 N.J. 411, 418 (2006), in which the Court vacated a verdict in a medical malpractice case because during the plaintiff's summation, counsel unfairly argued that the defendant had been unable to find any expert with a contrary opinion. In actuality, the defendant had secured such opposing experts but, due to untimeliness, had been procedurally barred from presenting them. Ibid. Because the plaintiff's comment in Bender "played on [the jury's] ignorance" of the procedural history and "implied an untruth," it was deemed misleading and prejudicial. Ibid. The same sort of prejudice exists here.

In discerning this error from the retrospective vantage point of a fully briefed and argued appeal, we are cognizant the matter was presented to the trial court in the midst of dealing with an array of issues affecting an imminent trial. The court needed to make a rapid decision and had to weigh the attendant competing interests and logistical complications. Even so, the denial of a fair corresponding discovery extension to the defense in a case that produced a very

large monetary verdict requires a remedy.

We consequently must vacate the damages awarded to plaintiff and remand for supplemental medical discovery and a new trial.[13]  The damages awarded to co-plaintiff Louis on his claim for loss of consortium also must be vacated, because they are "dependent upon and incidental to the viability of [the spouse's] personal injury action."  AAA Mid-Atl. Ins. of N.J. v. Prudential Prop. & Cas. Ins. Co., 336 N.J. Super. 71, 79 (App. Div. 2000).  Because the amount of damages that might be awarded at a new trial may not equate to the first verdict, the fees shifted pursuant to the offer of judgment rule and prejudgment interest must also be vacated, without prejudice.

B.

For the sake of completeness, and for guidance to the court on remand, we now address plaintiffs' un-previewed use of the storyboard (Exhibit P-7) at Dr. Giordano's de bene esse deposition.  We do not endorse the manner in which that diagram was thrust upon defense counsel at the deposition recording session without reasonable advance notice.

Plaintiffs have characterized the storyboard as a "demonstrative aid."  "Demonstrative or illustrative evidence may be evidence that replicates the

---

[13] We will discuss the scope of the new trial in Part IV, infra.

actual physical evidence . . . or illustrates certain aspects of an expert's opinion." Rodd v. Raritan Radiologic Assoc., P.A., 373 N.J. Super. 154, 165 (App. Div. 2004) (internal citations omitted). However, such demonstrative evidence should be limited to its demonstrative purpose and should not be "testimonial" or substantive to the point where it could mislead the jury. Id. at 167 (finding that a mammogram digitally altered and magnified by the plaintiff's attorney was not demonstrative but substantive evidence to prove defendant doctor had negligently failed to diagnose breast cancer).

Pure demonstrative aids can be referred to as "pedagogical-device summaries" and include "chalkboard drawings, graphs, charts, calculations or models [that] are not themselves admitted into evidence, but instead used 'as an aid to the presentation and understanding of the evidence.'" Heinzerling v. Goldfarb, 359 N.J. Super. 1, 8 (Law Div. 2002) (quoting United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998)) (emphasis added).

For example, in Macaluso v. Pleskin, 329 N.J. Super. 346, 350 (App. Div. 2000), a plaintiff in a personal injury action was permitted to utilize a video entitled "Soft Tissue Animation" as a "demonstrative aid." Although an expert doctor testified as to the plaintiff's injuries, he did not refer to the video in his testimony. Ibid. The video utilized illustrations and audio narration to explain

the type of injury the plaintiff claimed to have suffered and discussed generally how such injuries were caused. Id. at 350-53. On appeal, we ruled the video was not a proper demonstrative aid but "testimonial in nature" and "susceptible of being accepted by the jury as substantive evidence." Id. at 353. By contrast, in that same case, we held that x-ray images, which were explained by the testifying expert, were properly presented at trial as demonstrative. Id. at 356.

Visual aids should not be admitted if their probative value is offset by "undue prejudice, unfair surprise, undue consumption of trial time, or possible confusion of issues due to the introduction of collateral matters." Balian v. Gen. Motors, 121 N.J. Super. 118, 127 (App. Div. 1972).

Applying these principles, we agree with plaintiffs that the storyboard functioned as a demonstrative aid to Dr. Giordano's testimony. The procedural problem, however, is that defense counsel was caught off guard at the recording session and was not afforded reasonable and courteous advance notice of the case-specific exhibit. It was an unfortunate instance of "unfair surprise." Balian, 121 N.J. Super. at 127.

Had Dr. Giordano testified in person at trial, defendant could have made an immediate objection and sought the court's intervention before the exhibit was displayed. Alternatively, defendant could have objected to its use through

a motion in limine when plaintiffs disclosed P-7 during the pre-trial conference, as would have been required had Dr. Giordano testified in person. As it was, the doctor's testimony was pre-recorded before the court was apprised of the issue days later.[14]

We recognize that defense counsel could have attempted to telephone the court from the witness's office and sought an emergent ruling, although the court might not have been available. We also note that defense counsel could have refused to proceed and walked out of the session, but he might have risked sanctions for doing so. The court did ultimately and prudently require plaintiffs to remove the arguably suggestive words on the storyboard before the jury saw them on the video. But given how the witness used and pointed at the storyboard throughout his testimony, there was no feasible way to redact it entirely.

Our present Rules of Court do not expressly address this situation. Rule 4:25-7 does not mention, as part of the pretrial conference, an obligation to provide opposing counsel with any demonstrative aids that counsel expects to use at any forthcoming de bene esse deposition(s). Appendix XXIII to the Rules

---

[14] We note that defendant did not object to the witness's use of a generic skeletal model in his office to explain the human anatomy. We recognize that it is fairly common for medical experts to utilize such non-case-specific, three-dimensional models during their testimony without objection.

does obligate counsel to identify seven days in advance before a trial the demonstrative aids they intend to present at the trial, but the Appendix is silent with respect to disclosing such anticipated aids before de bene esse deposition(s) that are recorded outside of that seven-day window.[15]  Moreover, Rule 4:14-9 regulating de bene esse depositions does not cover the subject.

Because applicable guidelines did not exist at the time of Dr. Giordano's recorded testimony, we will not retroactively impose a remedy for this case as to the storyboard's usage.  Going forward, however, opposing counsel shall be presumptively entitled to reasonable advance notice of any demonstrative aids that the proponent of the witness intends to make use of at the de bene esse recording session, regardless of whether it falls within or outside of the seven-day window.  We refer the details and logistics of such notice to the Civil

---

[15]  A list of all exhibits to be offered in the party[']s case in chief, including all demonstrative exhibits prepared, prior to trial, by any witness, including an expert witness. All such exhibits shall be premarked for identification and shall be described briefly. Each party shall confer in advance of trial to determine if any such exhibits can be admitted into evidence by agreement or without objection.

[Pre-Trial Information Exchange, Pressler & Verniero, Current N.J. Court Rules, Appendix XXIII to R. 4:25-7(b) (emphasis added).]

Practice Committee for its consideration and possible rulemaking, with the wider input of the bench and bar.

III.

Defendant's second argument on appeal concerns the trial court's denial of his motion to bar the boating-safety opinions of Captain Keijer as net opinion. We are unpersuaded by that argument.

In addressing this evidentiary issue, we apply a deferential standard of review. Appellate scope of review of expert admissibility rulings by trial courts is limited. The trial court's decision should not be disturbed unless the ruling demonstrably comprises an abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008); see also Beavan v. Allergan U.S.A., Inc., ___ N.J. ___, ___ (2026) (reiterating this appellate review standard). However, if the trial court's decision implicates legal principles, those legal assessments are evaluated de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Defendant's argument to exclude Captain Keijer's testimony is based solely on a claim that his views about defendant's unsafe operation constitute inadmissible net opinion. Defendant does not quarrel with the captain's extensive qualifications as a maritime expert.

The doctrine barring the admission at trial of net opinions is a "corollary

of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (alterations in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). The net opinion doctrine requires experts to "give the why and wherefore" supporting their opinions, "rather than . . . mere conclusion[s]." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

The Supreme Court has recognized that "[t]he net opinion rule is not a standard of perfection." Ibid. The rule does not require that experts organize or support their opinions in a specific manner "that opposing counsel deems preferable." Ibid. Consequently, "[a]n expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Ibid. (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). An expert's failure "to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)). "Such omissions may be 'a proper "subject of exploration and cross-examination at a trial."'" Id. at 54-55 (quoting Rosenberg, 352 N.J. Super.

at 402).  See also  Beavan, ___ N.J. at ___ (reiterating the general principles of the net opinion doctrine).

As a threshold matter, before we consider the substance of defendant's net opinion argument, we first address its procedural untimeliness.  The issue was raised by the defense in the guise of a motion in limine on the cusp of trial.  The motion, in essence, was a motion for case-dispositive relief, because plaintiffs would not have been able to proceed to trial without expert testimony concerning the standards of care applicable to safe boating operation that are beyond the ken of ordinary citizens.  N.J.R.E. 702.  Yet the permitted time for a motion for summary judgment had long passed.  The deposition of Capt. Keijer had been taken months earlier.  Defendant offers no justification for waiting so long.

It was unfair to plaintiffs, who had prepared for trial, to have to respond to such a case-dispositive motion at the eleventh hour.  Such behavior has been disapproved of by our court.  Motions in limine are generally brought at the outset of trial for preliminary rulings on evidentiary issues, and "it is anticipated that, as a general rule, a motion in limine will not have a dispositive impact on a litigant's entire case."  Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 470 (App. Div. 2015).  The trial court had an ample basis to reject the motion on procedural grounds, but nonetheless elected to address it on the merits.

Turning to those merits, we are convinced the trial court appropriately denied defendant's motion. Defendant focuses mainly on Capt. Keijer's reliance on the New Jersey State Police Boating Safety Manual's definition of an "unsafe speed." He contends that applying that standard would result in converting all boating negligence cases into an imposition of strict liability. Defendant criticizes the expert for being unable to pinpoint a speed at which defendant's boat should have been proceeding when the passing boat created a wake. He argues that Capt. Keijer's observation that "an unsafe speed is a speed at which injury occurs" contravenes the jury charge on ordinary negligence and reasonable care, and should have been barred.

Having reviewed the record and the multiple published standards cited by Capt. Keijer, we concur with the trial court's finding that his expert testimony was not an improper net opinion. At both his deposition and his trial testimony, the captain adequately explained the "why and wherefore" underlying his opinions. The standards he discussed and applied reflect that the safe speed of a boat is a situational and multifaceted subject. As the captain reasonably explained, enumerating a fixed numerical speed to maintain when a vessel encounters a wake would ignore the specialized handling characteristics of the vessel, weather and visibility conditions, and other variables.

40

The New Jersey State Police Boating Safety Manual, the primary source cited by Capt. Keijer, states that "[n]o person shall operate a power vessel or allow a power vessel to be operated where the speed may cause danger of injury to life or limb or damage to property. The speed of every power vessel shall be regulated to avoid risk of damage, or injury by any means, from the power vessel's wake." New Jersey State Police, Boating Safety Manual (rev. Feb. 2006), 31 ("Boating Manual").[16] Additionally, slow speed is explicitly defined within this same chapter of the Boating Manual as "speed at which a power vessel moves through the water and is able to maintain minimum headway in relation to vessel or structure being passed." Ibid. Notably, the Boating Manual does not numerically specify maximum or minimum speeds.

The reasonableness of a speed is highly contextual and apparently not amenable to the numerical quantification demanded of Capt. Keijer by defendant. Nor did defendant proffer an expert of his own to show that such quantification is feasible, and if so, that defendant comported with that asserted standard of care.

Plaintiffs' expert presented more than ample reasons to show that

---

[16] https://www.nj.gov/njsp/info/pdf/marine/021606-boating-safety-manual.pdf (last visited Apr. 6, 2026).

defendant's trial testimony claiming that he reduced his speed to "one mile per hour" when he encountered the wake (despite his previous higher estimate) was not credible, and why such a slow speed physically would not have enabled the boat to turn into the wake at a safe and appropriate angle. The expert also provided sufficient reasons for criticizing defendant's failure to anticipate the wake sooner and take appropriate precautions.

We reject defendant's argument that the portion of the expert's testimony suggesting that defendant was not going at a safe speed because plaintiff was caused to bolt out of her seat improperly invited the jury to impose strict liability. Although we agree that the fact of an injury does not necessarily mean that a defendant acted negligently, and that this inference by the expert was improvident, the mechanics of the accident were germane to an overall assessment of the reasonableness of the boat's operation. Moreover, the court's jury instructions clearly explained the governing elements of negligence liability and plaintiffs' burden of proving that defendant failed to act with reasonable prudence.

We consequently affirm the court's denial of defendant's application to exclude Capt. Keijer's opinions, and for a directed verdict based on that argument. There are no other issues raised concerning the liability portion of

the verdict.

IV.

We conclude with a discussion of what relief is now appropriate on remand and the scope of a new trial, having found errors associated with the damages aspects of the case but not the liability aspects. On that point, we note our appreciation for the authorities called to our attention by counsel after we raised the question.

"The 'general rule [is] that issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues.'" Henebema v. S. Jersey Transp. Auth., 430 N.J. Super. 485, 513 (App. Div. 2013) (quoting Ahn v. Kim, 145 N.J. 423, 434 (1996)) (alteration in original). For example, in Caldwell v. Haynes, 136 N.J. 422, 443 (1994), the Supreme Court ordered a new trial in a negligence case on the issue of damages only, because there was no reversible error made in the distinct issue of liability. See also Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 520 (2011) ("defendant has not demonstrated that the summation concerning damages somehow affected the findings as to liability").

At oral argument on the appeal, defendant did not attempt to argue that the evidence of Karen's impending surgery was so prejudicial and passionate

that it inflamed the jury and tainted the liability determination. Rather, defendant argued that had he been able to obtain more discovery about the need for surgery, and had hypothetically shown with his own medical proofs that Karen was lying about or exaggerating her present symptoms, he could have likewise impeached Karen's testimony about defendant's negligence under a "false in one, false in all" theme. We are unpersuaded by this speculative claim.

We conclude that, despite the errors we have identified concerning the medical evidence bearing upon damages, the liability facet of the jury's verdict should not be disturbed. The damages issues were sufficiently distinct and separable from the liability issues.

We consequently remand for a damages-only trial.

V.

Affirmed in part and reversed in part, consistent with this opinion. The trial court shall hold a case management conference in thirty days to plan the additional appropriate medical discovery and other steps. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-2322-24